Drevet Hunt (Bar No. 240487)
dhunt@cacoastkeeper.org
CALIFORNIA COASTKEEPER
1100 11th Street, 3rd Floor
Sacramento, California 95814
Phone: (415) 606-0864
Fax: (415) 520-6125

Attorney for Plaintiff
San Diego Coastkeeper

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>CALMAT CO., a Delaware corporation doing business as Vulcan Materials Company,<br><br>Defendant. | Civil Case No.: __'23CV1090 BEN JLB__<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

SAN DIEGO COASTKEEPER ("Coastkeeper") ("Plaintiff"), by and through its counsel of record, hereby alleges as follows:

## I. JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2202 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On January 13, 2023, Coastkeeper issued a sixty-day notice letter ("First Notice Letter") to CalMat Co. doing business as Vulcan Materials Company ("Defendant"), informing Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122-DWQ (hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at Defendant's facility located at 2041 Heritage Road, Chula Vista, California 91913, or alternatively 2275 Hard Rock Road, Chula Vista, California 91911 ("Facility"). The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.      This First Notice Letter was addressed to Steve Hallmark, Plant Manager for the Chula Vista Plant, 2041 Heritage Road, Chula Vista, California 91913, as this was the Facility's address provided in Defendant's Notice of Intent to enroll under, and comply with, the terms of the Storm Water Permit. The First Notice Letter sent to 2041 Heritage Road was returned to sender.

4.      Plaintiff also sent the First Notice Letter to the registered agent for service of process for both CalMat Co. and Vulcan Materials Company, CT Corporation System, at

330 N. Brand Blvd., Suite 700, Glendale, California 91203.

5. Counsel for Defendant contacted Plaintiff on February 8, 2023.

6. On February 27, 2023, Coastkeeper issued a second sixty-day notice letter ("Second Notice Letter") to Defendant, again informing Defendant of its violations of the Storm Water Permit, and the Clean Water Act at the Facility. The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

7. The Second Notice Letter was addressed to Steve Hallmark, Plant Manager for the Chula Vista Plant, 2275 Hard Rock Road, Chula Vista, California 91913, as well as CalMat Co. dba Vulcan Materials Co Western Div., 500 N. Brand Blvd., Glendale, California 91203, and the registered agent for service of process for both CalMat Co. and Vulcan Materials Company, CT Corporation System, at 330 N. Brand Blvd., Suite 700, Glendale, California 91203.

8. Plaintiff is informed and believes that this Second Notice Letter was received by CalMat Co. dba Vulcan Materials Co. Western Division.

9. Both Notice Letters were sent to Defendant via certified mail as required by 40 C.F.R. § 135.2(a)(1) (2022). Both Notice Letters were also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of San Diego Regional Water Quality Control Board ("Regional Board") as required by section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). Both Notice Letters are attached hereto as Exhibits "A" and "B" and are fully incorporated herein by reference.

10. More than sixty (60) days have passed since the Second Notice Letter was served on the Defendant and the State and Federal agencies on February 27, 2023. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letters and in this complaint. *See* 33 U.S.C. §

1365(b)(1)(B). This action is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

11.    Venue is proper in the Southern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II. <u>INTRODUCTION</u>

12.    With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. These surface waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. As the Clean Water Act requires, these contaminated discharges can and must be controlled for the ecosystem to regain its health.

13.    Polluted discharges from mining and processing facilities such as the Facility contain pH-affecting substances; metals, such as copper, iron, aluminum, lead, zinc, cadmium, chromium, and arsenic; total suspended solids ("TSS"); nitrogen; nitrate plus nitrite ("N+N"); benzene; gasoline and diesel fuels; trash; oil and grease ("O&G"); total dissolved solids ("TDS"); dust; fines; solvents; acids; trichloroethane ("TCA"); trichloroethylene ("TCE"); and polycyclic aromatic hydrocarbons ("PAH"). Discharges of polluted storm water to the Otay River and its tributaries and outfalls pose carcinogenic and reproductive toxicity threats to the public and adversely affect the surface waters and the ecosystems they support.

14.    High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have

been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitats for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can also clog fish gills and interfere with respiration in aquatic fauna." *See* San Diego Water Quality Control Plan ("Basin Plan") at 3-31.

15.    Excess concentrations of nutrients such as nitrogen and phosphorus can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins which move up the food chain, causing fish kills and public health concerns.

16.    Heavy metals are well-known environmental pollutants due to their toxicity, persistence in the environment, and bioaccumulative nature. Exposure and ingestion of heavy metals can cause health problems in people and aquatic organisms, including neurological and reproductive effects. They are associated with fish deformities, survival, growth rate, welfare, and external morphology. Benthic macroinvertebrates are critical components of aquatic ecosystems and the food chain. Heavy metals are deleterious to this benthic community, including reduced species richness, reduced abundance, and a shift in community composition from sensitive to tolerant taxa. These heavy metals can bioaccumulate to toxic levels in aquatic animals such as fish, turtles, and other species, and have the potential to contaminate drinking water supplies. The negative effects of heavy metals on benthic communities, and bioaccumulation in fish of heavy metals also negatively impact birds and other fauna, which depend on the benthic communities for survival.

17.    Oil and grease can create surface films and can result in nuisance conditions because of offensive odors and visual impacts. *Id.* at 3-24. Oil and grease can also coat birds and aquatic organisms, adversely affecting respiration and/or thermoregulation. *Id.*

18.     "Many pollutants can alter the pH, raising or lowering it excessively. In some cases even small changes in pH can harm aquatic biota. The pH changes can alter the chemical form of certain constituents, thereby increasing their bioavailability and toxicity. For example, a decrease in pH can result in an increase in dissolved metal concentrations." *Id*. at 3-11.

19.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

20.     Plaintiff specifically alleges that the violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A. The Plaintiff

21.     San Diego Coastkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of California. Founded in 1995, Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego's watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

22.     Members of Coastkeeper own homes and reside in San Diego County and use and enjoy the tributaries flowing into the Otay River, the Otay River itself, San Diego Bay, and the bordering parks, pathways, and nature preserves along the receiving waters, and the waters and beaches of the Pacific Ocean. Members of Coastkeeper also use and enjoy the Otay River and San Diego Bay ("Receiving Waters") to bike, boat, kayak, swim, surf, bird watch, ride horses, view wildlife, hike, walk, run; for general aesthetic

enjoyment; and for other purposes. Coastkeeper members also engage in scientific study through pollution and habitat monitoring and cleanup and restoration activities.

23.    Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted storm water and non-storm water from the Facility, negatively impacts and impairs Coastkeeper's members' use and enjoyment of the Receiving Waters.

24.    The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs Coastkeeper members' use and enjoyment of these waters.

25.    The unlawful discharge of pollutants from the Facility has required Coastkeeper to expend its limited resources to study and combat pollution from the Facility.

26.    Thus, the interests of Coastkeeper and its members have been, are, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit.

27.    Continuing commission of the acts and omissions alleged herein will irreparably harm Coastkeeper's members, for which they have no plain, speedy, or adequate remedy at law.

**B. The Defendant**

28.    Plaintiff is informed and believes, and thereon alleges, that Calmat Co. is the owner and operator of the Facility located at 2041 Heritage Road, Chula Vista, California 91913, or alternative at 2275 Hard Rock Road, Chula Vista, California 91911.

29.    Plaintiff is informed and believes, and thereon alleges, that Calmat Co. is doing business as Vulcan Materials Co. at 2041 Heritage Rd., Chula Vista, CA 91913, or alternatively at 2275 Hard Rock Road, Chula Vista, California 91911.

30.    Plaintiff is informed and believes, and thereon alleges, that Calmat Co. is a Delaware Corporation doing business in California and registered with the California Secretary of State as entity number C0132449.

## IV.   <u>STATUTORY BACKGROUND</u>

### A. The Clean Water Act

31.     Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to section 402 of the CWA. 33 U.S.C. §§ 1311(a), 1342(b).

32.     Section 402(p) of the CWA establishes a framework for regulating industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single statewide general permit applicable to all industrial storm water discharges. 33 U.S.C. § 1342.

33.     Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. §§ 125.3(a)(2)(ii)–(iii) (2022).

34.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d) (2022); 40 C.F.R. § 122.44(d)(1) (2022).

35.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1) (2022).

36.     The "discharge of a pollutant" means, among other things, "any addition of

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2 (2022).

37.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2 (2022).

38.    The term "point source" means "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2 (2022).

39.    "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

40.    "Waters of the United States" includes waters that are tributaries to traditionally navigable waters. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also* 40 C.F.R. § 120.2(a).

41.    Sections 505(a)(1) and 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

42.    The Defendant is a "person" within the meaning of section 502(5) of the CWA, 33 U.S.C. § 1362(5).

43.    An action for injunctive relief is authorized under section 505(a) of the CWA, 33 U.S.C. § 1365(a).

44.    Pursuant to sections 309(d) and 505 of the CWA, each separate violation of the CWA occurring after November 2, 2015, and assessed on or after December 23, 2020, subject the violator to a penalty of up to $56,460 per day. *See* 33 U.S.C. §§ 1319(d)

and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation) (2022).

45.     Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

46.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers.

47.     The Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits.

48.     In California, the State Board and Regional Water Quality Control Boards are charged with regulating pollutants to protect California's water resources.

49.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R. § 123.25 (2022).

50.     Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, § XXI(A).

51.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

52.     On July 1, 2015, the operative Storm Water Permit became effective and

was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). Storm Water Permit, § I(A) (Finding 4).

53.     On November 6, 2018, the State Board issued an amended Order No. 2015-0122-DWQ, incorporating (1) Federal Sufficiently Sensitive Test Method Ruling, (2) TMDL Implementation Requirements, and (3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Amendment").

54.     In order to lawfully discharge storm water in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. Storm Water Permit, § I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *Id.* § II(B).

## C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

55.     The Storm Water Permit contains certain absolute prohibitions. *See id.* § III(A).

56.     The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id.* § III(B).

57.     Section III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

58.     Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants in discharges through implementation of Best Management Practices ("BMPs") that constitute BAT for toxic or non-conventional pollutants and BCT for conventional pollutants. *Id.* § V(A); *see also* 33 U.S.C. § 1311(b).

59.     Toxic pollutants are listed at 40 C.F.R. § 401.15 (2022) and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16

(2022) and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

60.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmark Values"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The EPA Benchmark Values provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2021 MSGP, 86 Fed. Reg. 10,269 (Feb. 19, 2021); 2015 MSGP, 80 Fed. Reg. 34,403, 34,405 (Jun. 16, 2015); 2008 MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

61.     The MSGP set forth EPA Benchmark Values for the following parameters, among many others: TSS, 100 mg/L; O&G, 15 mg/L; pH, 6–9 standard units ("s.u."); and nitrate & nitrite nitrogen ("N+N"), 0.68 mg/L. The Storm Water Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the EPA Benchmark Values. Storm Water Permit, § I(M) (Finding 62).

62.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmark Values indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

63.     Failure to develop or implement BMPs that constitute BAT and BCT is a Storm Water Permit violation. 33 U.S.C. § 1311(b); Storm Water Permit § V(A).

64.     Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment. Further, discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the

environment are violations of the Storm Water Permit. *Id.*, § VI(B).

65.     Section VI(C) requires that storm water and non-storm water discharges do not contain pollutants in quantities that threaten to cause pollution or a public nuisance. *Id*. § VI(C).

66.     Section VI(A) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id*. § VI(A).

67.     Water Quality Standards ("WQSs") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA, to be protective of the beneficial uses of the waters that receive polluted discharges.

68.     The Regional Board has issued the Water Quality Control Plan for the San Diego Region Basin ("Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." Basin Plan, 3-34.

69.     The following WQSs are established by the Basin Plan for the Otay River: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-21, 3-47.

70.     The Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." *Id*. at 3-32.

71.     "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

72.     The Basin Plan further states that waters shall not contain chemical

constituents, coloration, dissolved substances, or floating material in concentrations that cause nuisance or adversely affect beneficial uses. *Id*. at 3-19, 3-20, 3-30, 3-33. The Basin Plan requires that ambient pH levels shall not be changed from their natural condition by more than 0.2 s.u. for inland surface waters, bays, and estuaries, as a result of waste discharge. *Id*. at 3-11.

73.    In addition to the *de facto* beneficial uses of swimming and fishing applicable to the Receiving Waters herein, *see* 40 C.F.R. § 131.10(a) and (g), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units in the San Diego Region. Basin Plan at 2-7–2-12.

74.    The existing and potential Beneficial Uses for Otay River identified in the Basin Plan include: agricultural supply; industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; and rare, threatened, or endangered species. *Id.* at 2-63–2-64.

75.    The existing and potential Beneficial Uses for San Diego Bay identified in the Basin Plan include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sports fishing; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. *Id.* at 2-71.

76.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. 33 U.S.C. § 1313(d).

77.    According to the 2020/2022 303(d) List of Impaired Water Bodies, the Otay River downstream of the Facility is listed as impaired for copper, zinc, toxicity, dissolved oxygen, nitrogen, phosphorus, benthic community effects, TDS, pyrethroids, bifenthrin, and cyfluthrin. According to the 2020/2022 303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"). Other parts of San Diego Bay are impaired for

benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

78.     In addition, EPA has promulgated WQSs for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. Water Quality Standards, 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38 (2022).

79.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000). Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38 (2022). Discharges with pollutant levels in excess of the CTR criteria,[1] the Basin Plan, and/or other applicable WQSs are violations of Section VI(A) of the Storm Water Permit.

**D. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

80.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, §§ I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id*. § X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id*. § X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id*. § X(H). The SWPPP must include BMPs that

---

[1] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive     15
Relief and Civil Penalties

achieve pollutant discharge reductions attainable via BAT and BCT. *Id*. §§ I(D) (Finding 32), X(C).

81.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id*. § X.

82.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

83.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. *Id*. § X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the

SWPPP. *Id*. § XV.

84.    The Storm Water Permit also requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. *Id*. §§ X(A)(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*. § X(A)(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

85.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id*. §§ I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application Report Tracking System ("SMARTS"), within thirty (30) days. *Id*. § X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id*. § X(B)(3); *Id*. Fact Sheet, § II(I)(1).

**E. The Storm Water Permit's Monitoring and Reporting Requirements, Annual Report Requirements, and Exceedance Response Action Requirements**

86.    The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). *Id*. § X(I). The required monitoring, reporting, and MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. *Id*. §§ I(K) (Finding 69) and XI. The required monitoring, reporting, and MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id*. §§ I(K) (Finding 70) and XI.

87.     The objectives of the MIP are to ensure that BMPs have been adequately developed, implemented, and revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *Id.* § XI.

88.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.* § XI.

89.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. *Id.* §§ I(J) (Findings 55-56) and XI.

90.     Section XI(A)(4) of the Storm Water Permit requires that the MIP be revised as necessary to ensure compliance with the Storm Water Permit.

91.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

92.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.* § XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. *Id.* § X(B)(1).

93.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.* § XI(B)(4).

94.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm

Event" or "QSE").

95.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

96.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

97.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

98.     Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1 Exceedance Response Action ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the Storm Water Permit, or execute a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive reporting years, for any required sampling and analysis parameter under the Storm Water Permit. The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the Storm Water Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than

January 1, submit an ERA Report and certify that the ERA Report includes: (1) a summary of the ERA Evaluation, and (2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA report requirements are more stringent than those for a Level 1 ERA report.

## V. STATEMENT OF FACTS

### A. Facility Site Description

99.    The Defendant operates an industrial facility located at 2041 Heritage Road, Chula Vista, California 91913, or alternatively 2275 Hard Rock Road, Chula Vista, California 91911. The Facility encompasses at least 128 acres. The Facility's primary industrial activities are mining and processing rock and stone for construction purposes.

100.   The Facility's NOI states that Defendant operates the Facility under Standard Industrial Classification ("SIC") Code 1429, covering establishments engaged in the production and/or processing of crushed and broken stone.

101.   Plaintiff is informed and believes, and thereon alleges that, in addition to SIC Code 1429, SIC Code 1442, covering establishments which are engaged in the preparation of sand and gravel for construction uses, also applies to the Facility.

102.   Under these SIC codes, the General Permit requires Defendant to analyze storm water samples for particular parameters, including TSS, pH, O&G, and N+N.

103.   Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facility's pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6).

104.   Plaintiff is informed and believes, and thereon alleges, that the industrial areas, activities, and materials at the Facility include, involve, and take place in or around construction aggregates such as gravel, sand, and crushed stone; fuels, oils, solvents, detergent, flocculent, foam, and other hazardous materials; aggregate mining in an open pit, drilling, and blasting; aggregate crushing, screening, washing, and conveyance; aggregate stockpiling and storage; runoff from aggregate stockpiles and equipment stored

outdoors; material loading and delivery; vehicle equipment washing, maintenance, and fueling; wash products such as wash wastewater; and crushers, screens, wash plants, conveyors, steel beams, conveyor belts, electrical panels, associated wiring, and large off-road trucks and vehicles.

105.   The areas of industrial activity at the Facility also include, involve, and take place in or around the construction of a new processing plant, which will include a primary plant (jaw crusher), secondary plant (crusher and screen), finishing plant (multiple crushers and screens), and wet and dry processing plants.

106.   The construction of the new processing plant will add 5,500 square feet of impervious surface as foundations for screening towers.

107.   Plaintiff is informed and believes, and thereon alleges, that obsolete machinery, oil drums, aggregate stockpiles, metal parts, and other materials are stored outside at the Facility; that metal machinery is operated throughout the Facility; that extensive sediment and fine particulate is tracked throughout the Facility and off the Facility, across the Otay River via a bridge on Heritage Road, and along Main Street immediately adjacent to the northern boundary of the Otay River; that tanks and chemical containers, including diesel fuel, lube oils, and antifreeze, are stored in a Maintenance Area; and that industrial activities occur within the all drainage areas of the Facility without adequate cover or containment, resulting in discharges of polluted storm water.

108.   On multiple occasions, including on January 29, 2021, June 25, 2022, July 11, 2022, January 30, 2023, March 15, 2023, April, 6, 2023, and April 25, 2023, Coastkeeper representatives have observed and/or photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River. Numerous Chula Vista MS4 inlets line Main Street, all of which discharge directly into the Otay River.

109.   The Facility's own storm water sampling results from 2011 showed

extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS. (Exhibit "A" at 27-28; Exhibit "B" at 27-28.)

110.   The Facility's most recent samples available on SMARTS, dated March 4, 2022, tested the Facility's N+N concentration for the first time since at least 2015. This sample revealed a N+N concentration of 8.3 mg/L, over twelve times the EPA Benchmark for N+N of 0.68 mg/L. (Exhibit  "A" at 26; Exhibit "B" at 26.)

111.   The EPA Industrial Stormwater Fact Sheet for mineral mining and processing facilities indicates that pollutants associated with material handling and storage, equipment maintenance and cleaning, industrial processing or other operations include dust, TSS, TDS, fines, pH affecting substances, diesel, fuel, other oils, heavy metals, solvents, acids, arsenic, lead, cadmium, chromium, benzene, TCA, TCE, and PAHs.

112.   The Facility also operates heavy machinery and trucks, which are associated with metals such as aluminum, copper, and zinc.

113.   Not only is metal equipment operated and metal parts stored throughout the Facility, but copper in brake pads, and zinc in tires of heavy industrial trucks used to haul rocks aggregate around and on/off the Facility, are likely pollutant sources.

114.   Plaintiff is informed and believes, and thereon alleges, the industrial activities and materials at the Facility produce numerous pollutants including, but not limited to, pH-affecting substances; metals such as iron, aluminum, copper, zinc, lead, arsenic, cadmium, and chromium; TSS; TDS; nitrogen and N+N; trash; and O&G, diesel, fuel, other oils, solvents, and acids.

115.   According to the 2017 SWPPP, the Facility is composed of twelve Drainage Areas, several of which discharge directly into the Otay River via pipes which transect a vegetated berm bounding the Otay River ("Otay River Berm").

116.   Following an agreed upon Facility inspection, Plaintiff is informed and believes that the Facility's current drainage areas, grade breaks, and areas of various activities significantly differ from those indicated in the 2017 SWPPP and site map. For

example, a new processing plant is now located where Drainage Areas 4, 5, and 6, as well as the area immediately south of these drainage areas are marked on the 2017 site map. Defendant is also now mining aggregate in a new pit and blasting areas to the northeast of where Drainage Areas 9 and 10 are marked on the 2017 site map.

117.  According to the 2017 SWPPP and site map, Drainage Area 1 ("DA-1") includes the main office and parking area, weigh station, machine shop, and bulk oil storage. The 2017 SWPPP and site map indicate that storm water within DA-1 "is directed toward the Otay River Berm and contained within this area."

118.  On information and belief, including direct observations, Plaintiff alleges DA-1 discharges through a pipe that transects the Otay River Berm, at an unnamed discharge point, northwest of Drainage Point 1 ("DP-1").

119.  On information and belief, including direct observations, Plaintiff alleges that DA-1 lacks any retention capacity.

120.  According to the 2017 SWPPP and site map, Drainage Area 2 ("DA-2") contains aggregate stockpiles near the Facility entrance and a portion of an onsite access road through which extensive truck traffic passes. On information and belief, Plaintiff alleges that storm water from DA-2 flows toward the Otay River Berm and is discharged through a pipe which transects the Berm at DP-1.

121.  According to the 2017 SWPPP and site map, Drainage Area 3 ("DA-3") contains numerous access roads and aggregate storage stockpiles, vehicles and large processing equipment, and an elevated water tower which supplies water trucks for dust control. On information and belief, Plaintiff alleges that stormwater in this area flows toward the Otay River Berm where it is discharged into the Otay River through a pipe at Drainage Point 3 ("DP-3").

122.  According to the 2017 SWPPP and site map, Drainage Area 4 ("DA-4") contains access roads, aggregate storage stockpiles, and an aggregate loading area. The 2017 SWPPP and site map indicate that DA-4 lacks any retention capacity, and thus storm water in DA-4 "collects within this flat area and eventually overflows to either

Drainage Area 3 or 5 during a large storm event."

123.   Plaintiff is informed and believes, based in part on direct observations, that DA-4 is now a part of the Facility's new processing area, and that as such, storm water management and discharge locations significantly differ from those indicated in the 2017 SWPPP and site map.

124.   According to the 2017 SWPPP and site map, Drainage Area 5 ("DA-5") includes access roads, aggregate stockpiles, and extensive vehicles and other equipment, and "[s]torm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at [Drainage Point 4]."

125.   Plaintiff is informed and believes, based in part on direct observations, that DA-5 is now a part of the Facility's new processing area. This new processing area may still discharge at or near Drainage Point 4 ("DP-4"), but Defendant are constructing a new retention basin to the west of DP-4.

126.   Plaintiff is informed and believes, based in part on direct observations, that there is also an unidentified discharge point west of DP-4, with a pipe that transects the Otay River Berm.

127.   According to the 2017 SWPPP and site map, Drainage Area 6 ("DA-6") contains access roads, aggregate storage stockpiles, and an aggregate loading area, and that storm water overflows from DA-6 to DA-5 during a large storm event.

128.   Plaintiff is informed and believes, based in part on direct observations, that DA-6 is now a part of the Facility's new processing area, and that as such, storm water management and discharge locations significantly differ from those indicated in the 2017 SWPPP and site map.

129.   According to the 2017 SWPPP and site map, Drainage Area 7 ("DA-7") contains access roads, aggregate storage stockpiles, shop boneyards, and a portion of the material sorting plant, and that storm water flows into Sedimentation Basin 1, and is then directed into a vertical riser which drains south through a pipe which discharges into the Otay River at Drainage Point 2 ("DP-2").

130.   Plaintiff is informed and believes, based in part on direct observations, that the old material sorting plant is now decommissioned, and that as such, storm water management and discharge locations on the eastern side of DA-7 now likely significantly differ from those indicated in the 2017 SWPPP and site map.

131.   According to the 2017 SWPPP and site map, Drainage Area 8 ("DA-8") contains the aggregate washing facility and washed aggregate stockpiles, and that storm water flows into Retention Pond 3, from which overflow of the pond is directed to the pit in Drainage Area 9 ("DA-9") via an underground pipe.

132.   Plaintiff is informed and believes, based in part on direct observations, that some aggregate crushing, sorting, and/or washing activities are currently conducted in DA-8.

133.   According to the 2017 SWPPP and site map, DA-9 contains the active mining area, aggregate processing, and vehicular travel, and that storm water from DA-9 ponds in the mining pit.

134.   Plaintiff is informed and believes, based in part on direct observations, that DA-9 is no longer used as the active mining area, nor the aggregate processing area. The current active mining area is located to the northeast of DA-9 and DA-10.

135.   According to the 2017 SWPPP and site map, Drainage Area 10 ("DA-10") contains access roads, aggregate stockpiles, and mining activities, and that storm water flows to the southeast corner of DA-10 where overflow from DA-10 is directed to Drainage Area 11 ("DA-11").

136.   Plaintiff is informed and believes, based in part on direct observations and satellite images, that mining activities now occur in DA-10, and that the footprint of industrial activities in DA-10 is significantly larger than represented on the 2017 site map.

137.   According to the 2017 SWPPP and site map, DA-11 and Drainage Area 12 ("DA-12") contain access roads and aggregate stockpiles, and that drainage from DA-11 is directed southeast into DA-12, and that DA-12 eventually discharges in DA-8.

However, the flow and topographical lines on the 2017 site map indicate that that DA-11 discharges to the east into open space, and DA-12 discharges to the south into open space, both of which thereafter flow down a steep grade to the nearby Otay River.

138.   Plaintiff is informed and believes, based in part on direct observations, that the current conditions within DA-11 and DA-12 significantly differ from the 2017 SWPPP and site map.

139.   Plaintiff is informed and believes that the Facility's ingress/egress access road, while not owned by Defendant, is heavily utilized during almost all business hours by truck traffic associated with the Facility's industrial activities.

140.   Plaintiff is informed and believes that there are three additional pipe transects through the Otay River Berm which serve as discharge points along this access road, and that Defendant manages these pipe transect discharge points.

**B. The Otay River**

141.   The Otay River is the main waterway for one of the three major watersheds which make up the San Diego Bay Watershed Management Area, draining approximately 160 square miles. The reach of the river pertinent for this action is located in Chula Vista, San Diego County. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, ponds, and lakes carry significant importance for the inhabitants of the area.

142.   The Otay River also provides a critical and unique wildlife corridor as one of the last open green spaces connecting San Diego's eastern mountain ranges to the San Diego Bay. It is home to coyotes, grey foxes, raccoons, desert cottontails, and American badgers. Further, over 200 bird species utilize the Otay River Valley including the great blue heron, snowy egret, white tailed kite, northern harrier, red-tailed hawk, coots, ducks, and endangered birds such as the Least Bell's Vireo and southwestern willow flycatcher.

143.   In addition, the Otay River flows directly into the San Diego Bay National Wildlife Refuge ("SDBNWR"), a 2,300-acre protected refuge managed by the U.S. National Fish and Wildlife Service at the southern end of San Diego Bay. SDBNWR is a

coastal salt marsh and intertidal mudflat habitat which is home to a diversity of endangered, threatened, migratory, and native species, including a population of green sea turtles. As over ninety percent of the historic wetlands of San Diego Bay have been filled in, drained, or diked, this refuge provides critical habitat for hundreds of thousands of birds migrating along the Pacific Flyway, as well as for the Bay's resident species.

144.    Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding, rearing, and migration of the species known to inhabit San Diego County and that depend on surface water.

**C. Storm Water and Non-Storm Water Discharges from the Facility**

145.    Plaintiff is informed and believes, and thereon alleges, that the Facility has discharged, and continues to discharge, storm water and non-storm water from at least six discrete discharge locations.

146.    Plaintiff is informed and believes, and thereon alleges, that Defendant continuously tracks extensive fine sediments and other pollutants from the Facility's ingress/egress point during business hours, in both wet and dry weather. Plaintiff is informed and believes, and thereon alleges, pollutants associated with Defendant's industrial activities are discharged via the three additional pipe transect discharge points along the Facility's access road, all of which are managed and/or operated by Defendant.

147.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to properly identify all discharge locations from the Facility as required by the Storm Water Permit.

148.    All storm water and non-storm water pollutants from the Facility are discharged directly into the Otay River, or into the City of Chula Vista MS4, and thereafter into the Otay River. The Otay River flows into San Diego Bay, and ultimately into the Pacific Ocean.

149.    The Otay River, the San Diego Bay, and the Pacific Ocean are waters of the United States within the meaning of the CWA.

**D. The Facility's Storm Water Permit Coverage**

150.    Based on the Facility's industrial activities, Defendant must obtain Storm Water Permit coverage for the entire Facility. *See* Storm Water Permit, Attachment A.

151.    The Facility first obtained coverage under the Storm Water Permit on February 11, 2011.

152.    The Facility Owners and/or Operators most recently submitted an NOI on April 28, 2022.

153.    SMARTS lists the current Facility Waste Discharge Identification ("WDID") number for the Facility as 9 37I023019.

154.    SMARTS currently lists the Facility coverage under the Storm Water Permit as "Active."

**E. Defendant's Storm Water Discharges Contain Elevated Levels of Pollutants in Violation of the Storm Water Permit**

    **1.    Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitations**

155.    Plaintiff is informed and believes, and thereon alleges, that BMPs that achieve BAT/BCT have not been implemented at the Facility, in violation of Section V(A) of the Storm Water Permit.

156.    The Facility's self-reported storm water monitoring data indicates the Facility has discharged and continues to discharge pollutant levels above EPA Benchmark Values and the Storm Water Permit's Numeric Action Levels.

157.    The Facility has sampled almost exclusively for the minimum parameters of TSS, O&G, and pH for at least the past five years. The Facility's sample collected on March 4, 2022 tested the Facility's N+N concentration for the first time since at least 2015. This sample reflected a concentration of 8.3 mg/L for N+N, over twelve times the applicable EPA Benchmark and Numeric Action Limit of 0.68 mg/L. (Exhibit "A" at 26; Exhibit "B" at 26.) A sample collected on March 15, 2023 showed N+N at 3.4 mg/L, and a sample collected on March 22, 2023 showed N+N at 9.9 mg/L.

158.   The Facility's own storm water sampling results from 2011 evidenced extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS, strongly indicating that these pollutants are associated with the Facility's industrial activities and materials and present in the Facility's discharges despite Defendant's failure to sample for such parameters. *Id*.

159.   As further described *infra*, Defendant has failed and continues to fail to collect the required number of storm water samples each year, as well as fails to collect samples at each discharge point. For example, Defendant has failed to collect four samples in any year for at least the past five years despite numerous QSEs.

160.   Further, Defendant regularly collects samples from only one of the Facility's discharge locations during each sampling event, despite the Facility having numerous discharge locations, many of which have no retention capacity.

161.   Plaintiff is informed and believes, and thereon alleges, Defendant discharges pollutants in excess of EPA Benchmarks more frequently than its own monitoring data indicates. Defendant may not avoid its responsibility to comply with BAT/BCT requirements by violating the Storm Water Permit's sampling requirements.

162.   Plaintiff is informed and believes, and thereon alleges, Defendant's poor housekeeping has violated and continues to violate the BAT/BCT requirements of the Storm Water Permit. For example, on multiple occasions, including on January 29, 2021, June 25, 2022, July 11, 2022, January 30, 2023, March 15, 2023 and April, 6, 2023, and April 25, 2023, Coastkeeper representatives have observed and/or photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River.

163.   Plaintiff is informed and believes, and thereon alleges, Defendant's own storm water monitoring data, as well as its consistent failure to prevent extensive

pollutant trackout, demonstrate that Defendant has failed and continues to fail to develop and/or implement BMPs at the Facility necessary achieve compliance with the BAT/BCT standards.

164.   Plaintiff is informed and believes, and thereon alleges, the failure to develop and implement BMPs that achieve BAT/BCT as required by Effluent Limitation V(A) of the Storm Water Permit is a daily and ongoing violation that will continue until the BMPs at the Facility are improved to meet the required standards.

165.   Plaintiff is informed and believes, and thereon alleges, the weather station at the Brown Field Municipal Airport is about one (1) mile south of the Facility and is the closest available approximation of historical rainfall at the Facility.

166.   The Brown Field Municipal Airport reported rainfall on every day that the Facility collected a sample of their storm water discharge.

167.   Plaintiff is informed and believes, and thereon alleges, that on each of the dates identified in Exhibits "A" and "B" as a significant rain event (a rain event that produces stormwater runoff, which according to the EPA occurs with more than 0.1 inches of precipitation), the Facility discharges polluted storm water in violation of Effluent Limitation V(A) of the Storm Water Permit and in violation of the Clean Water Act. (Exhibit "A" at 29-32; Exhibit "B" at 29-32.)

168.   Each time the Facility discharges polluted storm water or non-storm water in violation of Effluent Limitation V(A) is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

169.   Plaintiff is informed and believes, and thereon alleges, these violations of Effluent Limitation V(A) are ongoing and will continue every time Defendant discharges polluted storm water from the Facility without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

170.   The Facility has been in violation of this Effluent Limitation since February 27, 2018, and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 2. Discharges of Polluted Storm Water in Violation of Storm Water Permit Receiving Water Limitations

171. Plaintiff is informed and believes, and thereon alleges, that the Facility has discharged and continues to discharge storm water and non-storm water that causes or contributes to an exceedance of applicable water quality standards, in violation of section VI(A) of the Storm Water Permit.

172. That Facility's own sample collected on March 4, 2022 revealed an N+N concentration of 8.3 mg/L, over eight times the Basin Plan Water Quality Objective for nitrogen of 1.0 mg/L. A sample collected on March 15, 2023 showed N+N at 3.4 mg/L, and a sample collected on March 22, 2023 showed N+N at 9.9 mg/L.

173. The Otay River is impaired for nitrogen. As such, Plaintiff is informed and believes, and thereon alleges, the Facility's polluted discharges cause or contribute to the Otay River's nitrogen impairment in violation of Receiving Water Limitation VI(A).

174. Plaintiff is informed and believes, and thereon alleges, the Facility routinely discharges various sediments, particulates, aggregates, dirt, mud, and other various other solids in excess of applicable WQSs.

175. Plaintiff is informed and believes, and thereon alleges, the Facility's storm water samples from 2011 evidence extremely high levels of specific conductance, indicating the Facility also likely discharges high levels TDS in violation of Receiving Water Limitations.

176. Plaintiff is informed and believes, and thereon alleges, the trackout of fine particulates via the access road further indicate the Facility regularly discharges TSS and TDS in excess of applicable WQS set forth in the Basin Plan.

177. Plaintiff is informed and believes, and thereon alleges, Defendant's failure to sample for all required parameters, collect the required number of samples, and sample each discharge point does not excuse its Receiving Water Limitations obligations under the Permit.

178. The Basin Plan mandates that "[w]aters shall not contain suspended and

settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32.

179.   "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

180.   High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability. *Id*. at 3-32.

181.   Agricultural supply is a designated beneficial use of the lower segment of the Otay River.

182.   The Otay River is impaired for TDS and benthic community effects.

183.   As such, Plaintiff is informed and believes, and thereon alleges, the Facility's polluted discharges cause and/or contribute to the Otay River's TDS, and benthic community effects impairments.

184.   The WQS in the Basin Plan are applicable WQS under the Storm Water Permit.

185.   Therefore, Plaintiff is informed and believes, and thereon alleges, that Defendant's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate Receiving Water Limitation VI(A) of the Storm Water Permit.

186.   Plaintiff is informed and believes, and thereon alleges, that Defendant's discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health, in violation of the Storm Water Permit Receiving Water Limitation VI(B).

187.   Plaintiff is informed and believes, and thereon alleges, that on each of the dates identified in Exhibits "A" and "B" as a significant rain event (a rain event that produces stormwater runoff, which according to the EPA occurs with more than 0.1

inches of precipitation), the Facility discharges polluted storm water in violation of Receiving Water Limitations VI(A) and (B) of the Storm Water Permit and in violation of the Clean Water Act. (Exhibit "A" at 29-32; Exhibit "B" at 29-32.)

188.   Each time the Facility discharges polluted storm water or non-storm water in violation of Receiving Water Limitation VI(A) or (B) is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

189.   Plaintiff is informed and believes, and thereon alleges, these violations of Receiving Water Limitation VI(A)-(B) are ongoing and will continue every time Defendant discharges polluted storm water from the Facility.

190.   The Facility has been in violation of these Receiving Water Limitations since February 27, 2018 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.   Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions

191.   Plaintiff is informed and believes, and thereon alleges, unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

192.   The Facility handles and uses large quantities of fuel, used oil, new lubricating oil, used antifreeze, foam, and various other hazardous materials subject to spills.

193.   Moreover, the Facility utilizes large quantities of water for rock washing and dust suppression. The Facility also handles and uses large quantities of fuel, used oil, new lubricating oil, used antifreeze, foam, and various other hazardous materials. This wash and dust suppression water is tracked throughout the facility, and off the facility as evidenced by the persistent and extensive trackout emanating from the Facility's ingress/egress driveway. Plaintiff's representatives have observed extensive trackout from the Facility's driveway during dry weather on several occasions.

194.   Plaintiff is informed and believes, and thereon alleges that such trackout and discharges of spilled materials, mud, sediments, and/or comingled NSWD violate Discharge Prohibitions III(B) of the Storm Water Permit.

195.   As Plaintiff has witnessed extensive trackout coming from the Facility's ingress/egress point on every occasion it has observed this location, Plaintiff is informed and believes, and thereon alleges the Facility is in violation of Discharge Prohibitions III(B) almost daily.

196.   Each time the Facility discharges polluted storm water or non-storm water in violation of Discharge Prohibition III(B) is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

197.   Plaintiff is informed and believes, and thereon alleges, these violations of Discharge Prohibition III(B) are ongoing and will continue every time Defendant discharges non-storm water from the Facility.

198.   The Facility has been in violation of Discharge Prohibition III(B) since February 27, 2018, and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**F. Defendant's Failure to Comply with the Storm Water Permit's SWPPP Requirements**

199.   Plaintiff obtained a SWPPP for the Facility dated May 15, 2017 ("2017 SWPPP"), from SMARTS. Plaintiff also obtained a SWPPP dated June 18, 2015, from SMARTS ("2015 SWPPP").

200.   Plaintiff is informed and believes, and thereon alleges, that the 2015 SWPPP was the operative SWPPP for the Facility prior to May 15, 2017.

201.   Plaintiff is informed and believes, and thereon alleges, that the 2017 SWPPP is the operative SWPPP for the Facility since May 15, 2017.

202.   Serious and significant deficiencies in the 2017 SWPPP and 2015 SWPPP include, for example, inaccurate and inconsistent descriptions of discharge locations and drainage generally throughout the Facility.

203.   Table 3.5 of the 2017 SWPPP claims that surface flows from Drainage Areas 2 through 12 are directed into sedimentation basins, while the Site Map and descriptions of the drainage areas in Section 2.1.4 of the SWPPP both show that surface flows from Drainage Areas 1 through 6 drain to discharge points.

204.   Plaintiff is informed and believes, and thereon alleges, the failure to properly identify discharge locations has further resulted in the failure to develop and describe necessary BMPs in the SWPPP and to implement an adequate SWPPP.

205.   The descriptions of the discharge points in the SWPPP are also inconsistent and incomplete. Table 5.2 names four discharge locations, identified as DP-1 through DP-4.

206.   DP-3, located in Drainage Area 3, is described as "[requiring a] large surcharge." No information regarding why this location requires a large surcharge, or what conditions would result in a discharge here.

207.   Plaintiff is informed and believes, and thereon alleges, the incomplete description of DP-3 does not provide sufficient information to guide BMP development, ensure BMPs implemented are sufficient, or ensure continued implementation of BMPs is performed as necessary.

208.   SWPPP Table 5.3 claims that Drainage Area 7 includes an unlined sedimentation basin with overflow to the Otay River. This is inconsistent with prior sections of the SWPPP that claim surface flows in Drainage Area 7 flow to the retention pond in Drainage Area 8.

209.   The inconsistent and incomplete description of flows and discharges in Drainage Area 7 does not provide sufficient information to guide BMP development, ensure BMPs implemented are sufficient, or ensure continued implementation of BMPs is performed as necessary.

210.   Based on Section 2.1.4 of the SWPPP and the Facility Map, stormwater surface flows in Drainage Areas 1 through 6 all flow directly into the Otay River through pipes that transect the berm in Drainage Areas 1, 3, and 4. However, the 2017 SWPPP is

inconsistent with its accounting of potential discharge locations. Section 5.5.5 claims "[t]here are five (5) likely discharge location(s)"; Section 5.6.2 identifies "a total of seven (7) possible sampling location(s)"; and Tables 5.2 and 5.4 claim there are only four discharge points and four sampling points.

211. Plaintiff is informed and believes, and thereon alleges, the inconsistent and incomplete description of flows and discharges throughout the Facility does not provide sufficient information to guide BMP development, ensure BMPs implemented are sufficient, or ensure continued implementation of BMPs is performed as necessary.

212. Coastkeeper's visual observations of the extensive trackout of fine particulates via the Facility's access road indicate the Facility lacks adequate storm water and non-storm water BMPs.

213. Plaintiff is informed and believes, and thereon alleges, that the Facility lacks sufficient BMPs around the massive stockpiles of materials on site. For example, the Facility Owners and/or Operators have failed to implement any erosion control measures, silt fences, wattles, or any other type of structural or non-structural BMP sufficient to prevent or reduce polluted runoff from the stockpiles, and discharging into the Otay River via multiple berm transect pipes.

214. Plaintiff is informed and believes, and thereon alleges, that the 2017 SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

215. Plaintiff is informed and believes, and thereon alleges, that the 2015 SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

216. Plaintiff is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in either the 2017 SWPPP or the 2015 SWPPP, the Defendant has not developed and/or implemented all appropriate BMPs required by Section X(H) of the Storm Water Permit.

217. The current SWPPP fails to include any information about the large processing plant on the southern side of the Facility, which is either completed or has been under construction for the past two to three years.

218.   Satellite imagery and direct observations indicate significant changes to the locations of some of the Facility's mining activities and other industrial operations, as well as major changes to drainage area size and delineation. None of this is reflected in the current SWPPP.

219.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility has not been updated or revised as required by Section X(B) of the Storm Water Permit.

220.   Plaintiff is informed and believes, and thereon alleges, that the 2017 SWPPP fails to identify, and the Defendant has failed to implement, the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

221.   Plaintiff is informed and believes, and thereon alleges, that the 2015 SWPPP fails to identify, and the Defendant has failed to implement, the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

222.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations.

223.   Plaintiff is informed and believes, and thereon alleges, that the significant exceedances of EPA Benchmark Values demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs to prevent the exposure of pollutants

to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

224. Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed and continues to fail to evaluate the effectiveness of the Facility BMPs and adequately revise the Facility's SWPPP, despite significant concentrations of pollutants in the Facility's storm water discharges.

225. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

226. Plaintiff is informed and believes, and thereon alleges, that the Defendant's failure to properly address pollutant sources and pollutants themselves results in the exposure of pollutants associated with industrial activities to precipitation.

227. Plaintiff is informed and believes, and thereon alleges, that the Defendant's failure to properly address these pollutants and the pollutant sources results in the exposure of pollutants to precipitation, which carries these pollutants into the Receiving Waters.

228. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP, is a separate and distinct violation of the Storm Water Permit and the CWA.

229. Plaintiff is informed and believes, and thereon alleges, Defendant has been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least February 27, 2018.

230. Defendant is subject to civil penalties for all violations of the CWA occurring since February 27, 2018.

**G. Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

231. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate MIP for industrial operations at the

Facility that complies with Section XI of the Storm Water Permit.

232.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to, pH-affecting substances, iron, aluminum, copper, zinc, TSS, TDS, N+N, trash, and O&G.

233.    Despite being required by SIC code and 303(d) listings for the Otay River to sample and analyze for several of those pollutants, Defendant does not regularly sample for any of those pollutants as required under Section XI(B)(6) and Table 1 of the Storm Water Permit, except for TSS, O&G, and pH.

234.    Plaintiff is informed and believes, and thereon alleges, that, except for its most recent sampling, since at least 2015 Defendant has failed to collect and analyze samples for N+N, as required by Defendant's designated SIC code. *See* Storm Water Permit, § XI(B)(6)(d).

235.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect and analyze samples for applicable industrial parameters related to receiving waters with 303(d) listed impairments of Otay River, including copper, zinc, toxicity, dissolved oxygen, nitrogen, phosphorus, benthic community effects, and TDS. *See Id*. § (XI)(B)(6)(e).

236.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect the required four storm water samples each year since the 2016-2017 permit year.

237.    In the two Annual Reports the Facility did file since 2016-2017, a lack of QSEs was cited as the reason for the lack of sampling.

238.    The U.S. Environmental Protection Agency estimates a rain event that will produce a discharge from a facility as one that produces at least 0.1 inches of precipitation in a 24-hour period.

239.    The rainfall data collected at the Brown Field Municipal Airport since June 2017 shows well over 100 days with 0.1 inches of rainfall or more.

240.    The Facility has been operating at least five days a week since June 2017,

yet Defendant has failed to collect the requisite number of storm water samples each year during that time.

241.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to report storm water samples as required under the Storm Water Permit since at least the 2016-2017 permit year.

242.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

243.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations at the Facility.

244.   Plaintiff is informed and believes, and thereon alleges, that Defendant has only collected samples from a single discharge location, varying between DP-1, DP-3, and an unknown discharge point called "Chula Vista DP," during any given sampling event.

245.   Plaintiff is informed and believes, and thereon alleges, that most of the Facility's twelve or more drainage areas lack any retention capacity indicating they will discharge during each rain event of at least 0.1 inches of precipitation.

246.   Plaintiff is informed and believes, and thereon alleges, that the Defendant consistently fails to perform, and/or have performed on their behalf, visual observations of storm water discharge locations during QSEs.

247.   Plaintiff is informed and believes, and thereon alleges, that the Defendant consistently failed, and continues to fail, to collect storm water samples during QSEs.

248.   Plaintiff is informed and believes, and thereon alleges, that Defendant has consistently failed to conduct one annual evaluation during the reporting year in accordance with Section XV of the Storm Water Permit.

249.   Plaintiff is informed and believes, and thereon alleges, that Defendant has consistently failed, and continues to fail, to submit Ad Hoc Reports in accordance with

Section XI(B)(11) of the Storm Water Permit.

250.   Plaintiff is informed and believes, and thereon alleges, that Defendant has consistently failed and continues to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including by failing to provide (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance.

251.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP, is a separate and distinct violation of the Storm Water Permit and the CWA.

252.   Defendant has been in daily and continuous violation of multiple MIP requirements since at least February 27, 2018.

253.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Storm Water Permit and CWA occurring since February 27, 2018.

## H. Defendant's Failure to Comply with the Storm Water Permit's Annual Reporting Requirements

254.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to submit an Annual Report for the 2014-2015, 2015-2016, 2017-2018, and 2018-2019 reporting years.

255.   Plaintiff is informed and believes, and thereon alleges, that the Annual Reports filed in the 2016-2017 and 2019-2020 reporting years had multiple deficiencies, including but not limited to: (1) claiming a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section XV of the Storm Water Permit; (2) claiming the SWPPP's BMPs address existing potential pollutant sources; and (3) claiming the SWPPP complies with the Storm Water Permit.

256.   Plaintiff is informed and believes, and thereon alleges, Defendant has submitted incomplete and/or incorrect Annual Reports and continue to fail to submit

complete and correct reports that comply with the Storm Water Permit.

257.   Every day Defendant conducts operations at the Facility without reporting as required is a separate and distinct violation of the Storm Water Permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

258.   Defendant has been in daily and continuous violation of the Permit's reporting requirements every day since at least February 27, 2018.

259.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the CWA occurring since February 27, 2018.

## I.   Defendant's Failure to Comply with Exceedance Response Action Requirements

260.   Plaintiff is informed and believes, and thereon alleges, that Defendant has entered Level 1 of the Exceedance Response Action program for N+N based on its 2021-2022 sampling results.

261.   Plaintiff is informed and believes, and thereon alleges, that Defendant has not conducted a Level 1 status evaluation by October 1, 2022, as required under Section XII(C) of the Storm Water Permit.

262.   Plaintiff is informed and believes, and thereon alleges, that Defendant further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2023, as required by Section XII(C)(2).

263.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed, and continues to fail, to submit adequate ERA Reports as required by the Storm Water Permit.

264.   Every day Defendant conducts operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Reports, is a separate and distinct violation of the Storm Water Permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

265.   The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's Level 1 status ERA evaluation requirement every day since October 1, 2022.

266.   The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit for failing to submit an adequate Level 1 ERA Report every day since January 1, 2023.

267.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the CWA occurring since the dates enumerated above.

## VI.   **ARTICLE III STANDING**

268.   Plaintiff brings this action on behalf of itself and its adversely affected members. Members of San Diego Coastkeeper (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes, and reside in San Diego County. They use and enjoy the waters into which Defendant's Facility discharges storm water with elevated levels of pollutants, including the Otay River, and the bays and wetlands into which those waters flow, including San Diego Bay, and the Pacific Ocean and beaches. Members of the Plaintiffs use and enjoy these waters for recreational, aesthetic, wildlife viewing, cleanup, restoration, conservation, educational, scientific, professional, and other purposes.

269.   Additionally, the Plaintiff and its members use these waters and adjacent riparian areas to engage in scientific study through pollution and habitat monitoring. They devote themselves to the study, protection, education, and conservation of the ecosystems, including species and wildlife and their habitats, that are impacted by the health of the waters into which the Facility discharges polluted storm water.

270.   The Otay River, bays and wetlands into which these waters flow, including the San Diego Bay and Pacific Ocean and beaches, have special aesthetic and recreational significance for Plaintiff's members and the public. Otay Valley Regional Park includes several miles of hiking, biking, and equestrian riding along the Otay River in a natural

environment.[2] SDBNWR is also publicly accessible, and includes pedestrian and bike trails used not only for physical outdoor recreation, but also for birding and wildlife viewing as they include "interpretive panels to enhance visitors' experience on the trail with information related to migratory birds, [and] salt marsh restoration."[3]

271.   Given the ecological importance and aesthetic and recreational significance of the Otay River, bays and wetlands into which these waters flow, including the San Diego Bay and Pacific Ocean and beaches, Plaintiff's members use and enjoy these waters and surrounding ecosystems and wetlands for numerous activities. They frequently use various areas downstream from the Facility for hiking, biking, enjoyment of natural open spaces, general aesthetic enjoyment, bird watching, and observation of other fauna including butterflies, and various fish, reptiles, and mammals. Plaintiff and its members have conducted restoration and conservation activities including cleanups, invasive species removal, and native species planting, in multiple downstream locations. Plaintiff and its members regularly lead ecological and educational tours in downstream waters of the Otay River, San Diego Bay, and surrounding waters, wetlands, and riparian areas, educating members of the public about various flora, fauna, and ecosystems. Plaintiff and its members also use these waters to engage in scientific study through pollution and habitat monitoring, including water quality sampling and assessment. Plaintiff and its members plan to continue all of the aforementioned activities.

272.   The discharge of storm water with elevated levels of pollutants from the Facility into downstream Receiving Waters reduces Plaintiff's and its members' use and enjoyment of those waters and the bays, beaches, and surrounding ecosystems and waters into which they flow. Defendant's discharges diminish Plaintiff's and its members'

---

[2] Otay Valley Regional Park Brochure, *available at* https://www.sandiego.gov/sites/default/files/legacy/park-and-recreation/pdf/OVRPmapWebView.pdf (last accessed Oct. 19, 2022).

[3] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *New Bayside Birding & Walking Trail Provides Enhanced Access to San Diego Bay NWR*, https://www.fws.gov/story/bayside-birding-walking-trail (last accessed Oct. 19, 2022).

ability to use and enjoy these downstream waters and surrounding ecosystems for recreational, aesthetic, restoration, conservation, educational, professional, and scientific pursuits. Plaintiffs and its members are aware of the pollution concerns discussed herein, and based on these concerns avoid or limit touching, swimming, fishing, and engaging in other activities in the Otay River, San Diego Bay, Pacific Ocean, beaches, and surrounding waters into which those waters flow when they would otherwise like to. The discharge of pollutants, including toxic pollutants in storm water from the Facility, harms aquatic life and species that live in the surrounding riparian habitat that Plaintiff and its members observe, study, consume, and contemplate spiritually. Defendant's polluted storm water and non-storm water discharges also degrade the surrounding riparian ecosystem and habitat that Plaintiff and its members work to protect and enjoy. Plaintiff and its members have a vested interest in protecting and enjoying healthy ecosystems and thriving natural flora and fauna populations. Defendant's pollutant-laden storm water and non-storm water discharges thus diminish Plaintiff's and its members' use and enjoyment of the Otay River, San Diego Bay, Pacific Ocean, beaches, surrounding waters into which those waters flow, and nearby impacted ecosystems and habitats. Plaintiff's and its members' reduced use and enjoyment of the Otay River, San Diego Bay, Pacific Ocean, beaches, and surrounding waters into which those waters flow and impacted ecosystems is directly traceable to Defendant's storm water discharges containing elevated levels of pollutants and unpermitted non-storm water discharges.

273.   Accordingly, the legal violations alleged in this Complaint therefore cause direct injury to the recreational, aesthetic, restoration, conservation, educational, professional, and scientific interests of the Plaintiff and its members. Plaintiff's and its members' recreational, aesthetic, restoration, conservation, educational, professional, and scientific injuries are concrete and particular to Plaintiff and each of its members who are adversely affected. Plaintiff's and its members' recreational, aesthetic, restoration, conservation, educational, professional, and scientific interests have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and

irreparably injured by the Facility's failure to comply with the CWA. On information and belief, Defendant's discharges of storm water with elevated levels of pollutants are ongoing and will continue because Defendant has not corrected the poor practices that led to these pollutant-laden discharges and non-storm water discharges. These are actual, concrete injuries, traceable to Defendant's conduct, that would be redressed by the requested relief. If Plaintiff is successful in this action, Defendant will be required to bring their discharges from the Facility to waters of the United States into compliance with the CWA and thus reduce their discharges of pollutants to the affected receiving waters, and either eliminate or seek permit coverage for their non-storm water discharges. This would benefit Plaintiff and its members in reducing the identified harms that they currently suffer as a result of the Defendant's pollutant-laden storm water discharges and unpermitted non-storm water discharges from the Facility.

274.   Moreover, Plaintiff and its members regularly review and use the reports, data, and other information uploaded to the SMARTS database by industrial dischargers as part of Storm Water Permit compliance, including by Defendant, for various purposes, including research, monitoring, program development, and policy advocacy. The information on SMARTS indicates the status of these industrial sources' compliance with the Storm Water Permit. This information includes the types and levels of pollutants in storm water discharges from each industrial storm water discharger, the location of the industrial sources and the waters into which they discharge, the nature of any pollution control or BMPs implemented by these industrial sources, and the State Board's and Regional Board's regulatory oversight of these industrial sources, including any enforcement actions taken by these agencies. This information allows members of the public to evaluate whether industrial sources are discharging unaddressed, problematic levels of pollution, and whether the sources are complying with the Storm Water Permit and thus the CWA. All the information other than information concerning the State Board's and Regional Board's regulatory oversight and enforcement actions that is available on SMARTS comes from the monitoring and reporting performed by the

industrial sources themselves as required by the Storm Water Permit.

275.   Plaintiff regularly logs on to SMARTS and reviews the information provided therein. Plaintiff and its members use the information on SMARTS to advance key aspects of their environmental protection missions, including using the information provided by industrial sources in response to the General Permit's requirements to submit annual reports (Storm Water Permit § XVI(A)), take and analyze storm water samples, and upload the results of analysis of storm water runoff samples to SMARTS (*Id*. § XI(B)(4)), develop and submit ERA reports (*Id*. § (XII)(D)), prepare and submit and update SWPPPs (*Id*. § (X)(A), (B)), and prepare and submit and update MIPs (*Id*. § (X)(I)). Plaintiff reviews the information in these documents for several purposes, including (1) to inform and evaluate whether industrial facilities are not complying with the Storm Water Permit and are discharging excessive levels of pollutants that threaten harm to the Plaintiff's members and to the public by degrading the environment utilized by both, (2) to allow Plaintiff to prioritize citizen suit enforcement against certain industrial facilities that are not complying with the Storm Water Permit based on discharges of excessive levels of pollutants that threaten to harm Plaintiffs' members and the public, (3) to decide whether to exercise its statutory rights to bring citizen suit enforcement seeking remedies to curb polluted storm water discharges, (4) to inform its members and the general public about industrial facilities that are discharging pollution at levels that risk damage to the environment and human health via Plaintiff's outreach efforts, (5) to develop recommendations to the State Board, the Regional Boards and EPA—in public comment on proposed regulatory actions, in work groups, and public meetings—about policy and legal changes or administrative measures (including enforcement) or changes in administrative approaches that would result in better protection against the environmental degradation caused by polluted storm water runoff from industrial sources, and (6) to communicate with other conservation organizations about efforts to address sources of water quality degradation. Plaintiff regularly discusses the information available on SMARTS during community engagement and outreach

efforts to inform the public and Plaintiff's members about sources of pollution in the waters they use and whether these sources are taking steps to curb pollutant discharges. This information helps these members to identify polluted storm water runoff that risks harm to the waters that they use, protect themselves from the physical harm arising from use of polluted waterways and to participate effectively along with Plaintiff in promoting public awareness of storm water pollution sources and the status of CWA compliance in California. This information further aids these members' ability to participate in commenting to the State Board and Regional Boards on effective administration of the CWA in California.

276.  Defendant has failed to submit full, complete, accurate, and timely information to SMARTS as required by the Storm Water Permit. Defendant's failure to submit this required information has directly harmed Plaintiff as an organization and its members by depriving them of information they would use for the purposes described in the preceding paragraphs. Each failure to submit full, accurate, current, and complete information to SMARTS as required by the Storm Water Permit has hampered Plaintiff's ability to (1) evaluate the full extent to which each Facility is failing to comply with the General Permit and discharging excessive levels of pollutants that threaten harm to the Plaintiff's members and to the public by degrading the environment utilized and valued by both, (2) inform its members and the general public about the extent to which each Facility is discharging pollution at levels that risk damage to the environment and human health, (3) accurately prioritize citizen suit enforcement against certain industrial facilities that are not complying with the Storm Water Permit based on discharges of excessive levels of pollutants that threaten to harm Plaintiff's members and the public, (4) accurately inform its members and the general public about industrial facilities that are discharging pollution at levels that risk damage to the environment and human health, (5) develop recommendations to the State Board, the Regional Boards and EPA about policy and legal changes or administrative measures (including enforcement) or changes in administrative approaches that would result in better protection against the environmental

degradation caused by polluted storm water runoff from industrial sources, and (6) communicate with other conservation organizations about efforts to address sources of water quality degradation. Plaintiff's members have been similarly harmed.

277.   The legal violations alleged in this Complaint relating to Defendant's failures to submit full, complete, accurate, and timely information to SMARTS therefore cause direct injury to Plaintiff and its members that is concrete and particularized. On information and belief, Defendant's failures to submit full, complete, accurate, and timely information to SMARTS are ongoing and will continue because Defendant has not corrected the poor practices that led to these failures. Plaintiff and its members' interests in full, complete, timely, and accurate information have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and irreparably injured by Defendant's failures to comply with the Storm Water Permit and CWA. These are actual, concrete injuries, traceable to Defendant's conduct (or lack thereof). The requested relief—Defendant's submission of full, complete, accurate, and timely information to SMARTS—would redress the injuries identified above.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act**
**[33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]**

278.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

279.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

280.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with

BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

281.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit §§ I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

282.   The Storm Water Permit's SWPPP requirements and Section V(A) of the Storm Water Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

283.   Each day since at least February 27, 2018, that Defendant has failed to develop and implement BMPs that achieve BAT and BCT is a separate and distinct violation of the Storm Water Permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

284.   The Defendant violates, and will continue to violate, the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

285.   Plaintiff is informed and believes, and thereon alleges, that the Defendant's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

286.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

287.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

288.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION
**Discharges of Non-Storm Water in Violation of the Storm Water Permit's Discharge Prohibitions and the Clean Water Act**
**[33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]**

289.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

290.   Plaintiff is informed and believes, and thereon alleges, that Defendant has and continues to discharge non-storm water from the Facility to waters of the United States.

291.   Plaintiff is informed and believes, and thereon alleges, that Defendant's discharges of non-storm water are not otherwise authorized by an NPDES permit.

292.   Plaintiff is informed and believes, and thereon alleges, that Defendant's unauthorized discharges of non-stormwater are ongoing and continuous.

293.   Defendant's unauthorized discharges of non-stormwater are a violation of the Storm Water Permit section III(D) and the Clean Water Act.

294.   Each day since at least February 27, 2018, that the Defendant discharges non-storm water in violation of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

295.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

296.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

297.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act**
**[33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]**

298.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

299.   Plaintiff is informed and believes, and thereon alleges, that the Facility has discharged and continues to discharge storm water containing levels of pollutants that adversely impact human health and/or the environment each time storm water discharges from the Facility.

300.   Plaintiff is informed and believes, and thereon alleges, that the Facility has discharged and continues to discharge storm water containing levels of pollutants that cause or contribute to exceedances of WQSs each time storm water discharges from the Facility.

301.   Defendant's discharges of storm water that contains pollutants in concentrations that exceed levels authorized by the Storm Water Permit's Receiving Water Limitations is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, § VI; 33 U.S.C. § 1311(b).

302.   The Defendant violates, and will continue to violate, the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the Facility.

303.   The Defendant violates, and will continue to violate, the Storm Water Permit's Receiving Water Limitations each and every time storm water that causes or contribute to exceedances of WQSs discharges from the Facility.

304.   Plaintiff is informed and believes, and thereon alleges, that the Defendant's violations of Receiving Water Limitations of the Storm Water Permit and the CWA are

ongoing and continuous.

305.   Each and every violation of the Storm Water Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

306.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

307.   An action for injunctive relief under the CWA is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

308.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FOURTH CAUSE OF ACTION**
**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act [33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]**

309.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

310.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of Section X of the Storm Water Permit.

311.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to implement the SWPPP for the Facility, in violation of Section X of the Storm Water Permit and the CWA.

312.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to adequately revise the SWPPP for the Facility, in

violation of Section X of the Storm Water Permit.

313.  The Defendant has been in violation of the Storm Water Permit's SWPPP requirements every day from at least February 27, 2018, to the present.

314.  The Defendant's failure to implement a SWPPP compliant with Section X of the Storm Water Permit is ongoing and continuous.

315.  The Defendant will continue to be in violation of the Storm Water Permit and the CWA each and every day the Defendant fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

316.  Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

317.  By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

318.  An action for injunctive relief under the CWA is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

319.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FIFTH CAUSE OF ACTION**
**Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act [33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]**

320.  Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth herein.

321.  Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to develop an adequate MIP for the Facility, in violation

of Section XI of the Storm Water Permit.

322.    Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to revise the MIP for the Facility, in violation of Section XI of the Storm Water Permit and CWA.

323.    Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to sufficiently sample and analyze storm water in violation of the Storm Water Permit and CWA.

324.    The Defendant has been in violation of the Storm Water Permit's monitoring and reporting requirements at the Facility every day from at least February 27, 2018, to the present.

325.    The Defendant's violations of their Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

326.    The Defendant will continue to be in violation of Section XI of the Storm Water Permit and the CWA, each and every day it fails to adequately develop, implement, and/or revise its MIP for the Facility.

327.    Each and every violation of the Storm Water Permit's monitoring and reporting requirements at the Facility is a separate and distinct violation of the CWA.

328.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

329.    An action for injunctive relief under the CWA is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

330.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# SIXTH CAUSE OF ACTION
## Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act
### [33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]

331.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

332.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to submit complete and accurate Annual Reports to the Regional Board, in violation of Section XVI of the Storm Water Permit.

333.   The Defendant has been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Section XVI of the Storm Water Permit.

334.   The Defendant has been in violation of Section XVI of the Storm Water Permit since at least February 27, 2018.

335.   The Defendant's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

336.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 27, 2018, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

337.   An action for injunctive relief under the CWA is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

338.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION
### Failure to Meet the Exceedance Response Action Requirements of the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act
### [33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f)]

339.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

340.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to submit adequate ERA Reports to the Regional Board, in violation of Section XII(C) of the Storm Water Permit.

341.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed, and continues to fail, to meet the ERA requirements of the Storm Water Permit, in violation of Section XII of the Storm Water Permit.

342.   The Defendant has been in violation of the CWA each day it has operated the Facility without meeting the ERA requirements of Section XII of the Storm Water Permit.

343.   Defendant has been in daily and continuous violation of the Permit's Level 1 status ERA evaluation requirement every day since October 1, 2022.

344.   Defendant has been in daily and continuous violation of the Permit's Level 1 ERA Report requirements every day since January 1, 2023.

345.   The Defendant's violations of the ERA requirements of the Storm Water Permit and the CWA are ongoing and continuous.

346.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 1, 2022, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2022).

347.   An action for injunctive relief under the CWA is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State

of California, for which harm they have no plain, speedy, or adequate remedy at law.

348.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VIII.  **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of sections 301(a)-(b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a)-(b), 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.   A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA of $64,618 per day per violation for violations that occurred after November 2, 2015, and assessed on or after January 6, 2023, as permitted by CWA section 309(d), 33 U.S.C. § 1319(d), and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2022);

d.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.   Any other relief as this Court may deem appropriate.

Dated:   June 12, 2023

_____
Drevet Hunt
Counsel for Plaintiff
San Diego Coastkeeper

## EXHIBITS

Exhibit "A"................................................................................................1

Exhibit "B"..............................................................................................33



January 13, 2023

**<u>VIA CERTIFIED MAIL</u>**
**<u>RETURN RECEIPT REQUESTED</u>:**

Steve Hallmark
Plant Manager
CHULA VISTA PLANT
2041 Heritage Road
Chula Vista, CA 91913

**<u>VIA U.S. MAIL</u>:**

CT Corporation System
Registered Agent for Service of Process
CALMAT CO.
330 N. Brand Blvd Suite 700
Glendale, CA 91203

CT Corporation System
Registered Agent for Service of Process
VULCAN MATERIALS COMPANY
330 N. Brand Blvd Suite 700
Glendale, CA 91203

**Re:**     <u>**Notice of Violation and Intent to File Suit under the Clean Water Act**</u>

To the Above-Listed Recipients:

San Diego Coastkeeper ("SDCK" or "Coastkeeper") is a non-profit organization dedicated to the health of California's marine and freshwater ecosystems and the communities dependent on them. SDCK has a long history of taking action to protect the resources of San Diego county, and it has come to our attention that CalMat Co. dba Vulcan Materials Co. Western Division (collectively "Chula Vista Plant Owners and Operators") are in ongoing violation of the Clean Water Act[1] and California's Statewide General Permit for Storm Water Discharges Associated with Industrial Activities[2] ("Storm Water Permit") at 2041 Heritage Road, Chula Vista, CA 91913, or alternatively 2275 Hard Rock Road, Chula Vista, California 91911 (the "Facility" or "Chula Vista Plant").

Violations of the terms and conditions of the Storm Water Permit are violations of the Clean Water Act. SDCK is sending this notice letter ("Notice Letter") pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act, and with it is notifying you of its intent to pursue

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ ("Storm Water Permit"), and amended by Order No. 2015-0122–DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit") (collectively "Storm Water Permit").

[sdcoastkeeper.org](sdcoastkeeper.org) | [info@sdcoastkeeper.org](info@sdcoastkeeper.org) | 619.758.7743
8305 Vickers Street, Suite 209
San Diego, CA 92111

Complaint Exhibit A 1

enforcement against the Chula Vista Plant Owners and Operators for the violations identified in this Notice Letter.[3]

# I.      BACKGROUND

## A.      Storm Water Pollution and the Waters Receiving Discharges from the Facility

With every significant rainfall event millions of gallons of polluted storm water originating from industrial properties such as the Facility pour into storm drains and waterways. The consensus among agencies and water quality specialists is that *storm water pollution accounts for more than 50% of the total pollution entering surface waters each year*. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. As the Clean Water Act requires, these contaminated discharges can and must be controlled for the ecosystem to regain its health.

Information available to Coastkeeper indicates that polluted discharges from the Facility contain pH affecting substances; metals, such as iron, aluminum, copper, and zinc; nitrogen, nitrite and nitrate ("N+N"); total suspended solids ("TSS") and dissolved solids; trash; oil and grease ("O&G"), and others. These polluted discharges adversely impact humans and the environment.

Copper and zinc, regulated by the California Toxics Rule ("CTR"), are known to be toxic to aquatic life. (40 C.F.R. § 131.38 *et seq*.). Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish. Benthic macroinvertebrates are critical components of aquatic ecosystems and the food chain. Heavy metals are deleterious to this benthic community. Although the effects are compounded with different factors such as altitude, temperature, stream width, turbidity, the influence of heavy metals on benthic macroinvertebrate communities was clearly established, and includes reduced species richness, reduced abundance, and a shift in community composition from sensitive to tolerant taxa. The negative effects of heavy metals on benthic communities, and bioaccumulation in fish also negatively impacts birds and other fauna, which depend on them for survival.

High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter

---

[3] Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of their intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. 40 C.F.R. § 135.2(a)(1).

predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can also clog fish gills and interfere with respiration in aquatic fauna." Basin Plan at 3-31.

"Many pollutants can alter the pH, raising or lowering it excessively. In some cases even small changes in pH can harm aquatic biota. The pH changes can alter the chemical form of certain constituents, thereby increasing their bioavailability and toxicity. For example, a decrease in pH can result in an increase in dissolved metal concentrations." *Id*. at 3-5. Oil and grease can create surface films and can result in nuisance conditions because of offensive odors and visual impacts. Oil and grease can also coat birds and aquatic organisms, adversely affecting respiration and/or thermoregulation.

The Otay River is a water of the United States and flows to San Diego Bay and the Pacific Ocean, both of which are navigable-in-fact waterbodies.[4] Monthly in-stream receiving water monitoring data reported in the California Environmental Data Exchange Network ("CEDEN"), and used for the 2020/2022 California Integrated Report including the 2020/2022 303(d) List of Impaired Water Bodies, establishes flow in the Otay River during the vast majority of months from 2009-2018.[5] Most samples were collected during dry weather conditions. Coastkeeper staff, volunteers, and other representatives have also frequently observed the Otay River flowing during various months of the year.

The San Diego Regional Water Quality Control Board ("Regional Board") has identified numerous "Beneficial Uses" of water bodies in the San Diego Region. The existing and potential Beneficial Uses for Otay River identified in the region's 2021 Water Quality Control Plan ("Basin Plan") include: agricultural supply; industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; and rare, threatened, or endangered species.[6] The existing and potential Beneficial Uses for San Diego Bay identified in the region's Basin Plan include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sports fishing; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; and shellfish harvesting.

According to the 2020/2022 303(d) List, the Otay River is impaired for copper, zinc, toxicity, dissolved oxygen, nitrogen, phosphorus, benthic community effects, total dissolved solids ("TDS"), Pyrethroids, Bifenthrin, and Cyfluthrin. According to the 2020/2022  303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic

---

[4] The Otay River, San Diego Bay, and Pacific Ocean hereinafter collectively referred to as "Receiving Waters."
[5] Data publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool.
[6] 2021 Water Quality Control Plan for the Central Coastal Basin – *available at* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/.

hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs").[7] Other parts of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

The Receiving Waters into which storm water runoff from the Chula Vista Plant flows are ecologically sensitive areas. The Otay River and portions of San Diego Bay provide critical migrating waterfowl habitat, nesting sites for sensitive bird species, and generally protect a tremendous diversity of plant and animal species. For example, the Otay River Valley is a critical and unique wildlife corridor, as it is one of the last open green spaces connecting San Diego's eastern mountain ranges all the way to San Diego Bay. It is home to coyotes, grey foxes, raccoons, desert cottontails, and American badgers. According to the City of Chula Vista, over 200 bird species utilize the Otay River Valley including the great blue heron, snowy egret, white-tailed kite, northern harrier, red-tailed hawk, coots, ducks, and endangered birds such as Least Bell's Vireo and southwestern willow flycatcher.[8]

Furthermore, the Otay River empties directly into the San Diego Bay National Wildlife Refuge ("SDBNWR"), a 2,300-acre protected refuge managed by the U.S. National Fish and Wildlife Service at the southern end of San Diego Bay.[9] SDBNWR is a coastal salt marsh and intertidal mudflat habitat which is home to a diversity of endangered, threatened, migratory, and native species, including a population of green sea turtles. As over ninety percent of the historic wetlands of San Diego Bay have been filled in, drained, or diked, this refuge provides critical habitat for hundreds of thousands of birds migrating along the Pacific Flyway, as well as for the bay's resident species.

As further explained above, pollutants discharged from the Chula Vista Plant are deleterious to local vegetation, invertebrates, insects, fish, birds, and other animals in and around the Receiving Waters. As such, these pollutant discharges strain the ecosystems on which numerous species, some of which are endangered, depend for survival, and negatively impact the public's, and Coastkeeper's members', ability to use and enjoy Receiving Waters.

**B.** **The Facility's Storm Water Permit Coverage**

Certain facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board"). (*See* Storm Water Permit, Finding #12.) Information available to Coastkeeper indicates the Facility first obtained Storm Water Permit coverage on February 11, 2011, under Waste Discharge Identification ("WDID") number as 9 37I023019. The Facility Owners and Operators most recently submitted an NOI on

---

[7] 2020/2022 Integrated Report – All Assessed Waters, https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2020_2022_integrated_report.html.

[8] Otay Valley Regional Park Brochure, https://www.chulavistaca.gov/home/showdocument?id=8405.

[9] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *About the Refuge*, https://www.fws.gov/refuge/San_Diego_Bay/about.html.

April 28, 2022 ("2022 NOI"), and as such the Facility remains covered by the Storm Water Permit. The 2022 NOI identifies the owner/operator of the Facility as "CalMat Co dba Vulcan Materials Western Division" and the Facility name and location as "Chula Vista Plant, 2041 Heritage Road, Chula Vista, CA 91913." The 2022 NOI lists the Facility as 128 acres in size, all of which is exposed to storm water, and the percentage of impervious surface is not listed. The Facility's most recent Storm Water Prevention Pollution Plan ("SWPPP"), dated May 15, 2017 ("2017 SWPPP"), states less than one percent of the Facility is impervious.

The NOI lists the Standard Industrial Classification ("SIC") code for the Facility is 1429 (Crushed and Broken Stone, NEC). SIC code 1429 facilities must obtain Storm Water Permit coverage for the entire facility. (*See* Storm Water Permit, Attachment A, ¶ 3.) Information available to Coastkeeper indicates that SIC code 1442 (Construction Sand and Gravel) also applies to the Facility. SIC Code 1442 applies to facilities operating sand and gravel pits and dredges, and in washing, screening, or otherwise preparing sand and gravel for construction uses. The 2017 SWPPP states the "Facility is an active mining operation where various rock products are produced for consumption by the local construction industry." (2017 SWPPP, § 2.1.2). The Facility's website further explains that it is a "supplier and distributor of construction materials" offering "construction aggregates, including gravel, sand and crushed stone."[10] Hence, SIC code 1442 also applies to the Facility.

### C.   Chula Vista Plant Owners and Operators' Liability for Violations

Information available to Coastkeeper, including the Facility's NOIs, indicates that CalMat Co. is an owner and/or operator of the Facility and has been since on or around November 2011. CalMat Co. is an active Delaware corporation organized in Delaware.

Information available to Coastkeeper, including the Facility's NOIs and SWPPPs, indicates that Vulcan Materials Company is an owner and/or operator of the Facility and has been since on or about November 2011. Vulcan Materials Company is an active Virginia corporation organized in New Jersey.

As this letter describes in detail, storm water discharging from the Facility consists of storm water associated with industrial activity and includes heavy metals and other contaminants, and therefore contains "pollutants," as defined by Clean Water Act Section 502(6), 33 U.S.C. § 1362(6). The Receiving Waters are "waters of the United States" within the meaning of Clean Water Act Section 502(7), 33 U.S.C. § 1362(7) and implementing regulations. Accordingly, the Chula Vista Plant Owners and Operators' discharge of storm water into waters of the United States constitutes a "discharge of pollutants" within the meaning of Clean Water Act Section 502(12), 33 U.S.C. § 1362(12). Further, as the owners and operators of the Facility, the Chula Vista Plant Owners and Operators are responsible for complying with the procedural and substantive requirements of the Storm Water Permit, which as explained below they have failed to do. Accordingly, the Chula Vista Plant Owners and Operators are liable for violations of

---

[10] https://www.vulcanmaterials.com/construction-materials/facilities/chula-vista-stone.

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 6

the Storm Water Permit and the Clean Water Act.

### D.     San Diego Coastkeeper

Coastkeeper is a 501(c)(3) environmental, non-profit public benefit corporation in accordance with the laws of the State of California. Using law, policy, and science, Coastkeeper advances policies and programs in the San Diego area to protect and enhance clean and abundant waters throughout southern California for the benefit of Californians and California ecosystems. Additionally, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, initiates enforcement actions on behalf of itself and its members. Coastkeeper's offices are located at 8305 Vickers St. Suite 209 San Diego CA 92111. Coastkeeper and its individual and organizational members throughout the state of California have an interest in the preservation and use of waters statewide, including the Otay River, San Diego Bay, and Pacific Ocean.

As explained above, the Chula Vista Plant Owners and Operators discharge pollutants into the Otay River, which flows downstream into San Diego Bay. The Otay River and San Diego Bay have special aesthetic and recreational significance for Plaintiffs' members and the public. Otay Valley Regional Park includes several miles of hiking, biking, and equestrian riding along the Otay River in a natural environment.[11] The San Diego Bay National Wildlife Refuge is also publicly accessible and includes pedestrian and bike trails used not only for physical outdoor recreation, but also for birding and wildlife viewing as they include "interpretive panels to enhance visitors' experience on the trail with information related to migratory birds, [and] salt marsh restoration."[12]

Given the Otay River's and San Diego Bay's ecological importance and aesthetic and recreational significance, Coastkeeper's members use and enjoy these Receiving Waters for numerous activities. They frequently use various areas downstream from the Chula Vista Facilities for hiking, biking, enjoyment of natural open spaces, general aesthetic enjoyment, bird watching, and observation of other fauna including butterflies, and various fish, reptiles, and mammals. Coastkeeper and its members have conducted restoration and conservation activities including cleanups, invasive species removal, and native species planting, in multiple downstream locations. Coastkeeper and its members regularly lead ecological and educational tours in downstream Receiving Waters, including birdwatching tours and kayaking tours, educating members of the public about various flora, fauna, and ecosystems. Coastkeeper and its members also use these waters to engage in scientific study through pollution and habitat monitoring, including water quality sampling and assessment. Coastkeeper and its members plan to continue enjoying all of the aforementioned activities.

---

[11] Otay Valley Regional Park Brochure.
[12] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *New Bayside Birding & Walking Trail Provides Enhanced Access to San Diego Bay NWR*, https://www.fws.gov/refuge/san_diego_bay/New_Birding_Trail.aspx.

Pollution and contamination discharged from the Chula Vista Facilities harms the aesthetic, educational, scientific, and recreational experiences of Coastkeeper's members. Coastkeeper and its members are aware of the pollution concerns discussed herein, and based on these concerns avoid touching, swimming, fishing, and engaging in other activities in Receiving Waters when they would otherwise like to. Coastkeeper and its members have a vested interest in protecting and enjoying healthy ecosystems and thriving natural flora and fauna populations. As polluted discharges from the Chula Vista Facilities are deleterious to local vegetation, invertebrates, insects, fish, birds, and other animals, Coastkeeper and its members' enjoyment of downstream ecosystems, flora, and fauna is negatively impacted by Defendant's polluted discharges. Thus, the interests of SDCK's members have been, are being, and will continue to be adversely affected by Chula Vista Plant Owners and Operators' failure to comply with the Clean Water Act and the Storm Water Permit.

## II.    THE FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.    The Facility Site Description and Industrial Activities

The "Facility is an active mining operation where various rock products are produced for consumption by the local construction industry." (2017 SWPPP, § 2.1.2). The Facility's website further explains that it is a "supplier and distributor of construction materials" offering "construction aggregates, including gravel, sand and crushed stone  for use in building bridges, parking lots, roads, airport runways, houses, apartments, schools, commercial building, and more."[13]

According to the 2017 SWPPP, industrial activities at the Facility include aggregate mining in an open pit, drilling, and blasting; aggregate crushing, screening, washing, and conveyance; aggregate stockpiling and storage; material loading and delivery; and vehicle and equipment washing, maintenance, and fueling. Associated equipment structures include crushers, screens, a wash plant, conveyors, steel beams, conveyor belts, electrical panels, associated wiring, and large off-road trucks and vehicles.

According to documents obtained from the City of Chula Vista and the San Diego Regional Water Quality Control Board ("Regional Board"), Vulcan is constructing a new aggregate processing plant at the Facility. Vulcan enrolled under the California Construction General Stormwater Permit ("CGP") on March 18, 2020 for construction activities related to this new processing plant under WDID 9 37C389786. The Facility's CGP coverage remains active. The new plant will include a primary plant (jaw crusher), secondary plant (crusher and screen), finishing plant (multiple crushers and screens), and wet and dry processing plants. Phase I of new project will add 5500 square feet of impervious surface as "foundations for screening towers." The processing plant will be located adjacent to the Otay River, with the potential to discharge directly into the river.

---

[13] https://www.vulcanmaterials.com/construction-materials/facilities/chula-vista-stone.

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 8

According to the 2017 SWPPP, materials used or generated at the Facility that have potential to be released with stormwater include: various sized aggregate materials; fuels, oils, solvents, detergents, flocculent, foam, and "various other hazardous materials"[14]; runoff from aggregate stockpiles and equipment stored outdoors; and wash products such as wash wastewater.

Information available to Coastkeeper indicates that obsolete machinery, oil drums, and other materials are stored outside; tanks and chemical containers, including diesel fuel, lube oils, and antifreeze, are stored in a Maintenance Area; and industrial activities occur within all drainage areas of the Facility, without adequate cover or containment, many of which result in discharges of polluted storm water.

### B.       Pollutants and Pollutant Sources Related to or Arising Out of the Facility's Industrial Activities

Virtually all of the industrial activities and materials described supra are exposed to storm water. The 2017 SWPPP acknowledges that all of the following industrial activities and materials can contribute to the Facility's storm water pollution: all quarry activities and the entire quarry area; outdoor material and aggregate storage; hazardous materials; storage tanks and drums containing used oil, new lubricating oil, used antifreeze drums, and various other hazardous materials; vehicle and equipment washing, maintenance, fueling; rock washing; and material loading, crushing, and sorting. However, the 2017 SWPPP states that the only pollutants associated with all of these Facility's industrial activities and materials are TSS, and various oils and petroleum products.

Information available to Coaskeeper indicates that pollutants associated with industrial activities and materials at the Facility further include but are not limited to: pH affecting substances; metals, such as iron, aluminum, copper, and zinc; nitrogen, N+N; total suspended solids TSS; TDS; trash; oil and grease O&G, and others. The Facility's own storm water sampling results from 2011 showed extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS. (Exhibit A). The Facility's most recent sample, dated March 4, 2022, tested the Facility's N+N concentration for the first time since at least 2015. Unsurprisingly, this sample revealed a N+N concentration of 8.3 mg/L, over twelve times the EPA Benchmark for N+N of 0.68 mg/L. (*Id.*)

The EPA Industrial Stormwater factsheet for mineral mining and processing facilities indicates that pollutants associated with material handling and storage, equipment maintenance and cleaning, industrial processing or other operations include dust, TSS, TDS, fines, pH affecting substances, diesel, fuel, other oils, heavy metals, solvents, acids, arsenic, lead, cadmium, chromium, benzene, TCA, TCE, and PAHs.

---

[14] *See* 2017 SWPPP, Table 2.1.b.

The Facility also operates heavy machinery and trucks, which are associated with metals such as aluminum, copper, and zinc. Not only is metal equipment operated and metal parts stored throughout the Facility, but copper in brake pads, and zinc in tires of heavy industrial trucks used to haul rocks aggregate around and on/off the Facility, are likely pollutant sources.

On multiple occasions, including on January 29, 2021, June 25, 2022, and July 11, 2022 Coastkeeper representatives have observed and photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River. Numerous Chula Vista MS4 inlets line Main Street, all of which discharge directly into the Otay River.

### C.     Facility Storm Water Flow and Discharge Locations

According to the Facility SWPPP, the Facility is composed of 12 drainage areas. Although the Facility has two retention ponds from which the SWPPP claims stormwater discharges are not expected, several drainage areas discharge into the Otay River, most of which have no retention capacity. As noted in the 2017 SWPPP, "[t]he Otay River is bounded by a vegetated berm (Otay River Berm). There are several pipe transects along the Otay River Berm which direct runoff through the berm directly into Otay River. These pipe transects allow discharge from the Chula Vista Quarry into the Otay River."

According to the SWPPP, Drainage Area 1 (DA-1) includes the main entrance, main office and parking area, weigh station, maintenance shop, and bulk oil storage. Information available to Coastkeeper indicates that all vehicles, including intensive materials delivery trucks traffic, pass through DA-1. According to the SWPPP, "[s]tormwater within the drainage area is directed towards the Otay River Berm and is contained within this area."  However, DA-1 lacks any retention capacity, and the SWPPP fails to identify any BMPs that would prevent stormwater from discharging from DA-1. Information available to Coastkeeper indicates stormwater will flow either west toward the Facility entrance and ultimately into the Otay River, or east into Drainage Area 2 (DA-2) where it will discharge into the Otay River at DP-1.

According to the SWPPP, DA-2 includes a portion of an onsite access road and aggregate storage stockpiles near the entrance. Information available to Coastkeeper also indicates that extensive truck traffic passes through DA-2. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-1."

According to the SWPPP, Drainage Area 3 (DA-3) is a large area in the southern portion of the Facility with numerous access roads and aggregate storage stockpiles, and an elevated water tower which supplies water trucks for dust control. Information available to Coastkeeper, including publicly available satellite imagery, also shows vehicles and large processing equipment in this area. DA-3 is the largest drainage area immediately adjacent to the Otay River. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-3."

According to the SWPPP, Drainage Area 4 (DA-4) contains access roads, aggregate storage stockpiles and an aggregate loading area. According to the SWPPP, "[s]torm water falling in this area collects within this flat area and eventually overflows to either Drainage Area 3 or 5 during a large storm event." However, DA-4 lacks any retention capacity, and the SWPPP fails to identify any BMPs that would prevent from discharging from DA-1.4

According to the SWPPP, Drainage Area 5 (DA-5) includes access roads and aggregate storage stockpiles. Information available to Coastkeeper, including publicly available satellite imagery, also shows extensive vehicles and equipment in this area. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-4."

According to the SWPPP, Drainage Area 6 (DA-6) includes access roads, aggregate storage stockpiles, and an aggregate loading area, and that storm water overflows from DA-6 to DA-5 during a large storm event. However, information available to Coastkeeper, including the Facility SWPPP's own flow lines, and satellite imaging, indicate that flows from DA-6 will discharge from DA-6's eastern boundary into natural open space.

According to the SWPPP, Drainage Area 7 (DA-7) includes access roads, aggregate storage stockpiles, shop boneyards, a portion of the material sorting plant. "Surface flows are directed into Sedimentation Basin 1. Discharge from Basin 1 is directed into a vertical riser which drains south through a 12" pipe and into the Otay River at DP-2."

According to the SWPPP, Drainage Area 8 (DA-8) includes the aggregate washing facility and washed aggregate stockpiles. The SWPPP states that captured fines are recovered and used as topsoil mixture, but fails to describe how or where. The SWPPP further states that wash discharge water is directed to Retention Pond 3, and that overflow of the basin is directed via an underground pipe conduit to the pit in Drainage Area 9 (DA-9).

According to the SWPPP, DA-9 includes the active mining area, aggregate processing, and vehicular travel. Storm water will pond in the mining pit.

According to the SWPPP, Drainage Area 10 (DA-10) includes access roads and aggregate storage stockpiles, and drainage is directed to the southeast corner of the drainage area, and that overflow from DA-10 is directed to Drainage Area 11 (DA-11). Information available to Coastkeeper, including satellite imaging, indicates that mining activities may also be occurring in DA-10, and that the footprint of industrial activities in DA-10 is significantly larger than represented on the Facility's site map. This information further indicates that northeastern portion of the Facility has vastly different drainage patterns, and likely discharges into natural open space to the north and east of the Facility, and thereafter down a steep grade to the nearby Otay River.

According to the SWPPP, DA-11 and Drainage Area 12 (DA-12) both include access roads and aggregate storage stockpiles, and that drainage from DA-11 is directed southeast into

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 11

DA-12, and that DA-12 eventually discharges in DA-8. However, the flow and topographical lines on the Facility's own site map indicate that that DA-11 discharges to the east into open space, and DA-12 discharges to the south into open space, both of which thereafter flow down a steep grade to the nearby Otay River. Further, information available to Coastkeeper, including satellite imaging, indicates that the industrial activities, drainage, and flow patterns significantly differ from the 2017 SWPPP and site map.

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person that discharges storm water associated with industrial activity must comply with the terms of the Storm Water Permit. (*See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* Storm Water Permit, Fact Sheet at VII.) The Storm Water Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations;[15] (2) SWPPP requirements; and (3) self-monitoring and reporting requirements. In addition, facility owners and operators must submit Exceedance Response Action Plans ("ERA Report") outlining effective plans to reduce pollutants if sampling at the facility indicates a pollutant above the Numeric Action Level ("NAL").[16] Facility owners and operators must strictly comply with all the terms and conditions of the Storm Water Permit. Specific violations of the Storm Water Permit and the Clean Water Act occurring at Chula Vista Plant are described below.

### A.   Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitations

Effluent Limitation V.A. of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic[17] and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[18] The United States EPA has established Benchmarks – levels of pollutants in storm water discharges – that provide objective measure of whether the BMPs implemented at a facility are achieving BAT/BCT standard.[19] As such,

---

[15] On November 6, 2018, the State Water Board amended the General Permit ("2018 Amendment") to incorporate, among other requirements, Numeric Effluent Limitations ("NELs") for selected parameters. These new requirements became effective on July 1, 2020. (2018 Amendment, Attachment E.) Any exceedances of an NEL following July 1, 2020, are now per se violations of the Storm Water Permit and Clean Water Act.

[16] An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Storm Water Permit, Section XII.A.)

[17] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, benzene, arsenic, lead, and zinc, among others.

[18] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, total suspended solids, oil and grease, pH, and fecal coliform.

[19] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP)*, as

discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[20] Likewise, the Storm Water Permit has developed Numeric Action Levels, which are set at levels indicative of whether BMPs need improvement to comply with the BAT/BCT standards of the Clean Water Act.

Information available to Coastkeeper, including its review of publicly available information and observations, indicate that BMPs that achieve BAT/BCT have not been implemented at the Facility. For example, the Facility's self-reported storm water monitoring data indicates the Facility has discharged and continues to discharge pollutant levels above EPA Benchmarks and the Storm Water Permit's Numeric Action Levels. As noted in Section II.B, *supra*, the Facility has sampled almost exclusively for the minimum parameters of TSS, O&G, and pH for at least the past five years. The Facility's most recent sample, collected on March 4, 2022, tested the Facility's N+N concentration for the first time since at least 2015. This sample reflected a concentration Limit of 8.3 mg/L for N+N, over twelve times the applicable EPA Benchmark and Numeric Action Limit of 0.68 mg/L. (Exhibit A). Further, the Facility's own storm water sampling results from 2011 evidenced extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS, strongly indicating that these pollutants are associated with the Facility's industrial activities and materials and present in the Facility's discharges despite Vulcan's failure to sample for such parameters. (*Id.*)

Additionally, as further described in Section III.E.2, *infra*, the Facility regularly collects samples from only one of the Facility's discharge locations during each during each sampling event, despite the Facility having numerous discharge locations, many of which have no retention capacity, and will thus discharge during most QSEs. Vulcan may not avoid its responsibility to comply with BAT/BCT requirements by violating the Storm Water Permit's sampling requirements.

Further, on multiple occasions, including on January, 29, 2021, June 25, 2022, and July 11, 2022 Coastkeeper representatives have observed and photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River.

The Facility's own storm water monitoring data, as well as its consistent failure to prevent extensive pollutant trackout, demonstrate that the Chula Vista Plant Owners and Operators have failed and continue to fail to develop and/or implement BMPs at the Facility necessary achieve compliance with the BAT/BCT standards.[21] The failure to develop and implement BMPs that achieve BAT/BCT as required by Effluent Limitation V.A. of the Storm

modified effective February 19, 2021 ("Multi-Sector Permit"); *see also*, 86 Federal Register 10269 (February 19, 2021).
[20] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).
[21] *Id.* at 921-25.

Water Permit is a daily and ongoing violation that will continue until the BMPs at the Facility are improved to meet the required standard.

Coastkeeper puts Chula Vista Plant Owners and Operators on notice that, as a result of their failure to develop and implement BMPs that achieve BAT/BCT, Storm Water Permit Effluent Limitation V.A. has been and will continue to be violated each time storm water discharges from the Facility. Exhibit B contains a historical record of precipitation recorded at the Brown Field Municipal Airport since June 2017.[22] The weather station at the Brown Field Municipal Airport is about one (1) mile south of the Facility. The Brown Field Municipal Airport reported rainfall on every day that the Facility collected a sample of their storm water discharge. Coastkeeper believes Brown Field Municipal Airport to be the closest available approximation of historical rainfall at the Facility. Accordingly, at a minimum, on each of the dates identified in Exhibit B storm water discharged from the Chula Vista Plant in violation of Effluent Limitation V.A. of the Storm Water Permit and in violation of the Clean Water Act. These violations of Effluent Limitation V.A. are ongoing and will continue every time Chula Vista Plant Owners and Operators discharge polluted storm water from the Facility without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Coastkeeper will update the dates of violations when additional information and data become available.

Each time Chula Vista Plant Owners and Operators discharge polluted storm water in violation of Effluent Limitation V.A. of the Storm Water Permit is a separate and distinct violation Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Further, each day the Chula Vista Plant Owners and Operators have failed and continue to fail to develop and implement BAT and BCT at the Facility is a violation of the Effluent Limitation V.A. of the Storm Water Permit and the Clean Water Act. These violations are ongoing and continuous. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least January 13, 2018.

**B.      Discharges of Polluted Storm Water in Violation of Storm Water Permit Receiving Water Limitations**

Receiving Water Limitation VI.A. of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS") in any affected receiving water.[23] Discharges

---

[22] The rainfall data was collected from the National Oceanic and Atmospheric Administration ("NOAA") National Centers for Environmental Information's "Daily Summaries" function, accessible at https://www.ncdc.noaa.gov/cdo-web/datasets/GHCND/stations/GHCND:USW00023277/detail (last visited October 29, 2021).

[23] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999). The Basin Plan includes a narrative toxicity standard

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 14

that contain pollutants in excess of applicable WQSs violate the Storm Water Permit Receiving Water Limitations. Further, Receiving Water Limitation VI.B. of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitations.

That Facility's most recent sample, collected on March 4, 2022, which is also the only sample analyzed for N+N since at least 2015, reveal an N+N concentration of 8.3 mg/L, over eight times the San Diego Basin Plan Water Quality Objective for nitrogen of 1.0 mg/L. The Otay River is impaired for nitrogen. As such, the Facility causes or contributes to the Otay River's nitrogen impairment in violation of Receiving Water Limitation VI.A.

Information available to Coastkeeper indicate the Facility routinely discharges various sediments, particulates, aggregates, dirt, mud, and other various other solids in excess of applicable WQSs. For example, the Facility's stormwater samples from 2011 evidence extremely high levels of specific conductance, indicating the Facility also likely discharges high levels TDS in violation of Receiving Water Limitations. The trackout of fine particulates via the access road further indicate the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality Objectives. The Facility's failure to sample for all required parameters, as explained further in Section II.E.2, *infra*, does not excuse Vulcan's Receiving Water Limitations obligations under the Permit.

The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."[24] "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development."[25] High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability.[26] Agricultural supply is a designated beneficial use of the lower segment of the Otay River. Receiving water monitoring data indicates the Otay River is impaired for TDS. As such, the Facility's polluted discharges cause and/or contribute to the Otay River's TDS, and benthic community effects impairments.

The Basin Plan is an applicable WQSs under the Storm Water Permit. Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Storm Water Permit. Storm Water Permit, Section VI.A.

---

which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."
[24] Basin Plan at 3-32.
[25] *Id*. at 3-31.
[26] *Id*. at 3-32.

Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Storm Water Permit Receiving Water Limitations. *See* Storm Water Permit, Section VI.B.

Receiving Water Limitations are violated each time storm water discharges from the Facility containing concentrations of pollutants that exceed the Basin Plan or other applicable water quality standards. Accordingly, at a minimum, on each of the dates identified in Exhibit B, storm water discharged from the Chula Vista Plant violates Receiving Water Limitations VI.A–B of the Storm Water Permit and the Clean Water Act. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS or adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.A. and Receiving Water Limitation VI.B. of the Storm Water Permit and of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).[27] These violations are ongoing and continuous. Coastkeeper will update the dates of violation when additional information and data becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least January 13, 2018.

## C.   Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions

Discharge Prohibition III.B of the Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. (Storm Water Permit, Discharge Prohibition III.B.)

Information available to Coastkeeper indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, the Facility handles and uses large quantities of fuel, used oil, new lubricating oil, used antifreeze, foam, and various other hazardous materials. Moreover, the Facility utilizes large quantities of water for rock washing and dust suppression. Unfortunately, this wash and dust suppression water is tracked throughout the facility, and off the facility as evidenced by the persistent and extensive trackout emanating from the Facility's ingress/egress driveway. Such trackout and discharges of spilled materials, mud, sediments, and/or comingled NSWD violate Discharge Prohibitions III.B of the Permit.

These discharge violations are ongoing and will continue until Chula Vista Plant Owners and Operators develops and implements adequate BMPs that prevent non-storm water discharges or obtain separate NPDES permit coverage for these discharges. Each time Chula Vista Plant Owners and Operators discharge prohibited non-storm water in violation of Prohibition III.B of

---

[27] Receiving Water Limitations are independent Storm Water Permit requirements that must be complied with, and thus, even if Facility Owners and Operators submit any Exceedance Response Action Plan(s) pursuant to Section XII of the Storm Water Permit, the violations of the Receiving Water Limitations described in this Notice Letter are ongoing.

the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Coastkeeper will update the number and dates of violations when additional information becomes available. The Chula Vista Plant Owners and Operators are therefore subject to civil penalties for violating the Clean Water Act each time non-storm water discharges from the Facility since at least January 13, 2018.

### D.   Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. The specific SWPPP requirements of the Storm Water Permit, and the Chula Vista Plant Owners and Operators' violations of them, are set forth below.

#### 1.   Storm Water Permit SWPPP Requirements

Sections X.A-H of the Storm Water Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the Storm Water Permit. *See also* Storm Water Permit, Appendix 1.) The objectives of the SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to develop and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. (*See* Storm Water Permit, Section X.C.)

The SWPPP must include, among other things, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the Storm Water Permit; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a monitoring implementation plan; annual comprehensive facility compliance evaluation; the date that the SWPPP was initially prepared and the date of each SWPPP amendment; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.A-H.)

Further, the Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. (Storm Water Permit, Section X.A-B.) The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 17

drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. (Storm Water Permit, Sections X.B and XV.)

        2.    <u>The Chula Vista Plant Owners and Operators Have Violated and Continue to Violate the Storm Water Permit SWPPP Requirements</u>

Information available to Coastkeeper indicates that Chula Vista Plant Owners and Operators have been and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. Serious and significant deficiencies include, for example, inaccurate and inconsistent descriptions of discharge locations and drainage generally throughout the Facility. First, Table 3.5 of the 2017 SWPPP claims that surface flows from drainage areas 2 through 12 are directed into sedimentation basins. This is untrue based on the language of the SWPPP itself and SDCK's own observations. The Site Map and descriptions of the drainage areas in Section 2.1.4 of the SWPPP both show that surface flows from drainage areas 1 through 6 actually drain to discharge points. The failure to properly identify discharge locations has further resulted in the failure to develop and describe necessary BMPs in the SWPPP (and to implement an adequate SWPPP).

Further, the descriptions of the discharge points themselves are inconsistent. Table 5.2 names four discharge locations, identified as DP-1 through DP-4. DP-3, located in drainage area 3, is described as "[requiring a] large surcharge."[28] No explanation is provided as to why this discharge point requires a "large surcharge," and this discharge point has only been sampled two times in the previous five reporting years, so when it is sampled, there is not enough context provided by the sample results to determine what this could mean. In addition, SWPPP Table 5.3 claims that drainage area 7 includes an unlined sedimentation basin with overflow to the Otay River. This is inconsistent with prior sections of the SWPPP that claim surface flows in drainage area 7 flow to the retention pond in drainage area 8. Based on Section 2.1.4 of the SWPPP and the Facility Map, Coastkeeper believes that stormwater surface flows in drainage areas 1 through 6 all flow directly into the Otay River through pipes that transect the berm in drainage areas 1, 3, and 4. Finally, the 2017 SWPPP is inconsistent with its accounting of potential discharge locations. Section 5.5.5 claims "[t]here are five (5) likely discharge location(s)"; Section 5.6.2 identifies "a total of seven (7) possible sampling location(s)"; and Tables 5.2 and 5.4 claim there are only four discharge points and four sampling points. Despite this, the Facility has never sampled from more than one discharge location at a time, as is required by Section XI.B.5 of the Storm Water Permit.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling of non-storm water with storm water, and the subsequent discharge of high concentrations of pollutants from the Facility, in violation of the Storm Water Permit. As discussed *supra*, Coastkeeper's visual observations of the extensive trackout of fine

---

[28] *See* 2017 SWPPP, Table 5.2.

particulates via the Facility's access road, strongly indicate the Facility lacks adequate storm water and non-storm water BMPs. Furthermore, the Facility lacks any BMPs around the massive stockpiles of materials. The Facility Owners and/or Operators have failed to implement any erosion control measures, silt fences, waddles, or any other type of structural or non-structural BMP to prevent or reduce polluted runoff from the stockpiles, and discharging into the Otay River via multiple berm transect pipes. Thus, the Facility Owners and/or Operators have failed to develop and implement a SWPPP with adequate BMPs as required by Section X.H. of the Storm Water Permit.

The Facility Owners and/or Operators have failed to revise the Facility's SWPPP to ensure compliance with the Permit. As previously noted, the SWPPP's accounting of drainage areas and discharge points contradicts itself, is inaccurate, and fails to align with actual site conditions. The current SWPPP fails to include any information about the large processing plant on the southern side of the Facility, which is either completed or has been under construction for the past two to three years. Furthermore, satellite imagery indicates significant changes to the locations of some of the Facility's mining activities and other industrial operations, as well as major changes to drainage area size and delineation. The Facility Owners and/or Operators failure to revise and update the SWPPP is a violation of the Section X.B. Storm Water Permit.

Accordingly, the Chula Vista Plant Owners and Operators have failed and continue to fail to adequately develop, implement, and/or revise a sufficient SWPPP, in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. Likewise, each and every failure of the Chula Vista Plant Owners and Operators to meet a specific requirement of the Storm Water Permit's SWPPP requirements is a violation of the Storm Water Permit and the Clean Water Act. As such, the Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least January 13, 2018, and likely long before that date. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least January 13, 2018.

**E.      Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program**

The Storm Water Permit requires permittees to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting, and in order to continue, industrial activities. The M&RP requirements of the Storm Water Permit, as well as the Chula Vista Plant Owners and Operators' violations of them, are set forth below.

1.      Storm Water Permit M&RP Requirements

Sections X.I. and XI.A-D of the Storm Water Permit require facility operators to develop

and implement an adequate M&RP that meets all of the requirements of the Storm Water Permit. The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (*See* Storm Water Permit, Section XI.)  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. (*Id*.)

Section XI.A. of the Storm Water Permit requires all visual observations of drainage areas and locations at least once each month, as well as at the same time sampling occurs at a discharge location. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. (*Id*., Section XI.A.2.)  Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. (*Id*., Section XI.A.3.)

Section XI.B.6.a-b of the Storm Water Permit requires all permittees to analyze samples for total suspended solids, oil and grease, and pH. The Storm Water Permit further requires permittees to analyze samples for pollutants associated with their industrial operations, additional applicable parameters listed in Table 1 of the Permit based on SIC code, and industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. (*Id*., Section XI.B.6.c-e.)

2. <u>Chula Vista Plant Owners and Operators have Violated and Continue to Violate the Storm Water Permit M&RP Requirements</u>

Chula Vista Plant Owners and Operators have and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP.

For example, the Chula Vista Plant Owners and Operators have failed and continue to fail to develop an M&RP that ensures the collection of storm water samples from all discharge locations at the Facility. While the Chula Vista Plant Owners and Operators have maintained that they have four storm water discharge locations in both of their Annual Reports since 2016, they have only collected samples from a single discharge location, varying between DP-1, DP-3, and an unknown discharge point called "Chula Vista DP." As mentioned above, the 2017 SWPPP states that there are at least four, and may be as many as seven discharge points throughout the Facility. Most of the Facility's twelve or more drainage areas lack any retention capacity indicating they will discharge during each rain event. The failure to collect samples at all discharge locations is a violation of the Storm Water Permit's Monitoring and Reporting Requirements.

Furthermore, the Chula Vista Plant Owners and Operators have regularly failed to sample the required number of Qualifying Storm Events ("QSEs")[29] during a permit year. Under the Storm Water Permit, a discharger is required to collect and analyze a total of four storm water samples during the year, specifically two samples between July 1 and December 31, and two samples between January 1 and June 30. The Chula Vista Plant Owners and Operators failed to collect four samples in every permit year since the 2016-2017 permit year. In the two Annual Reports the Facility did file, a lack of QSEs was cited as the reason for the lack of sampling. The U.S. Environmental Protection Agency estimates that a rain event that will produce a discharge from a facility as one that produces at least 0.1 inches of precipitation in a 24-hour period. The rainfall data collected in Exhibit B shows well over 100 days with 0.1 inches of rainfall or more at the Brown Field Municipal Airport since June 2017. The Facility has been operating at least five days a week for this whole period, but Chula Vista Plant Owners and Operators have failed to collect the requisite number of storm water samples despite ample opportunities to do so.

The Chula Vista Owners and Operators have also failed to analyze storm water samples for all parameters required. (*See* Storm Water Permit, Section XI.B.6.) As previously discussed in Section I.B, *supra*, SIC code 1442 (Construction Sand and Gravel) applies to the Facility. Table 1 of the Storm Water Permit requires facilities with SIC code 144X (sand and gravel) to analyze samples for N+N, however, the Facility has repeatedly failed to do so in violation Section XI.B.6.d. (*See* Exhibit A). The Facility has also failed to analyze for all parameters associated with its industrial activities including metals, such as iron, aluminum, copper, and zinc; nitrogen, N+N; total suspended solids TSS; TDS; trash, as further discussed in Section II.B, *supra*. (*See* Storm Water Permit, Section XI.B.6.c.) . The Facility has also failed to analyzed samples for applicable industrial parameters related to receiving waters with 303(d) listed impairments. The Otay River is impaired for copper, zinc, toxicity, dissolved oxygen, phosphorus, benthic community effects, and TDS, and yet the Facility has failed to analyze samples for any of these pollutants. (*See* Storm Water Permit, Section XI.B.6.e.)

Furthermore, based on information available to Coastkeeper, the Chula Vista Plant Owners and Operators have failed to conduct the monthly visual observations of storm water discharges in violation of Section XI.A.3 of the Storm Water Permit.

In sum, the Chula Vista Plant Owners and Operators have failed and continue to fail to adequately develop, implement, and/or revise an M&RP, in violation of M&RP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or revised M&RP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. Likewise, each and every failure of the Chula Vista Plant Owners and Operators to meet a specific requirement of the Storm Water Permit's monitoring and reporting requirements is a violation of the Storm Water Permit and the Clean Water Act. The Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least January 13, 2018, and likely long before that date. These violations are ongoing, and Coastkeeper will include additional violations when

---

[29] A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. (Storm Water Permit, Section XI.B.1.)

information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least January 13, 2018.

### F.       Failure to Comply with the Storm Water Permit's Reporting Requirements

Section XVI.A of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 15 each year. Section XVI.B requires that the Annual Report include a Compliance Checklist that indicates whether a Discharger complies with and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance, an identification of all revisions to the SWPPP made during the previous reporting year, and the date(s) of the Annual Evaluation. (Storm Water Permit, Sections XVI.B.1-4.) Permittees are also required to report all sampling and analytical results within 30 days of obtaining the results. (*See* Storm Water Permit, Section XI.B.11.)  In addition, the Storm Water Permit requires a Permittee whose discharges violate Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards, along with an implementation schedule. (Storm Water Permit, Section XX.B.)

The Chula Vista Plant Owners and Operators have failed and continue to fail to submit Annual Reports that comply with these reporting requirements. The Facility failed to submit an Annual Report for the 2014-2015, 2015-2016, 2017-2018, and 2018-2019 reporting years. The Annual Reports filed in the 2016-2017 and 2019-2020 had multiple deficiencies, including but not limited to: (1) claiming a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section XV of the Storm Water Permit; (2) claiming the SWPPP's BMPs address existing potential pollutant sources; and (3) claiming the SWPPP complies with the Storm Water Permit. These certifications are erroneous because, as discussed in detail above, the Facility's BMPs and SWPPP are woefully inadequate and fail to comply with the Storm Water Permit. These failures and omissions violate the Storm Water Permit, yet the Annual Reports fail to identify these violations or identify steps that will be taken to correct them as required.

The Chula Vista Plant Owners and Operators have submitted incomplete and/or incorrect Annual Reports and continue to fail to submit complete and correct reports that comply with the Storm Water Permit. Every day the Chula Vista Plant Owners and Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least January 13, 2018. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least January 13, 2018.

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 22

### G.      Failure to Comply with Exceedance Response Action Requirements

The Storm Water Permit incorporates a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). (Storm Water Permit, Section I.N.75.) The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. (*Id.*, Section XII.B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. (*Id.*, Section XII.C.) Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. (*Id.*) The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. (*Id.*, Sections XII.C.1.a–b.) Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. (*Id.*, Section XII.C.2.) The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. (*Id.*) The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. (*Id.*) "A Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.*, Section I.N.77.

The Facility Owners and/or Operators have failed to comply with several of the Storm Water Permit's ERA requirements. The Facility's storm water monitoring data from the 2021-2022 reporting period shows the Facility exceeded the annual average NAL for N+N with a concentration of 8.3 mg/L, well over the limit of 0.68 mg/L. (Ex. A). As such, the Facility entered Level 1 status for the aforementioned TSS on July 1, 2022. However, the Owners and/or Operators failed to complete a Level 1 ERA evaluation by October 1, 2022, as required by Section XII.C.1 of the Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2023, as required by Section XII.C.2. In fact, the Facility has failed to complete any Level 1 ERA reports to date.

The Facility Owners and/or Operators' failure to comply with the Storm Water Permit's ERA requirements is an ongoing violation of the Permit and Clean Water Act. The Facility Owners and/or Operators are in daily violation of the Permit and Clean Water ACt. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting an adequate Level 1 ERA Report, complete SWPPP

revisions, and implement the required BMPs is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Permit's Level 1 status ERA evaluation requirement every day since October 1, 2022. The Facility Owners and/or Operators have been in daily and continuous violation of the Permit's Level 1 ERA Report requirements every day since January 1, 2023. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's requirements.

## IV.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties in excess of $59,973 per day per violation for violations that occurred after November 2, 2015 where penalties are assessed on or after January 12, 2022.

In addition to civil penalties, Coastkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## V.   PERSONS RESPONSIBLE FOR THE VIOLATIONS

Coastkeeper puts Chula Vista Plant Owners and Operators on notice that they, and each of them, are responsible for the violations described above. If additional companies or persons are subsequently identified as also being responsible for the violations set forth above, Coastkeeper puts you on formal notice that it intends to include them in this action.

## VI.   NAME AND ADDRESS OF NOTICING PARTY

The name, mailing address, and telephone number of the noticing party is as follows:

San Diego Coastkeeper
8305 Vickers St., Suite 209
San Diego CA 92111 Phone: (619) 758-7743
Email: info@sdcoastkeeper.org

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 24

## VII.   COUNSEL

Coastkeeper has retained legal counsel to represent it in this matter. Please direct **all** communications to:

Drevet Hunt
Legal Director
California Coastkeeper Alliance
1100 11th Street, 3rd Floor
Sacramento, CA 98514
Phone: (415) 606-0864
Email: dhunt@cacoastkeeper.org

Patrick McDonough
Senior Attorney
San Diego Coastkeeper
8305 Vickers St., Suite 209
San Diego CA 92111
Phone: (619) 758-7743
Email: patrick@sdcoastkeeper.org

## VIII.   CONCLUSION

Coastkeeper is interested and eager to discuss implementation of effective remedies for the violations described in this Notice Letter. If you wish to pursue such discussions, please contact Mr. McDonough. To avoid prejudice to its interests, Coastkeeper does not intend to delay filing a complaint at the end of the 60-day notice period, but nonetheless remains willing and able to discuss remedies for the violations identified in this letter. If you wish to pursue such discussion, we suggest that you initiate them at your earliest convenience, and well before the 60-day notice period provided for by the Clean Water Act expires.

Sincerely,

Patrick McDonough
Senior Attorney
San Diego Coastkeeper

Drevet Hunt
Legal Director
California Coastkeeper Alliance

Notice of Intent to Sue: Clean Water Act
*CalMat Co. dba Vulcan Materials Co., Chula Vista Plant*
January 13, 2023
Page 25

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control
Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Michael Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Martha Guzman
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

**Exhibit A: Storm Water Sampling Data from Vulcan Materials Chula Vista Plant**

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 3/4/22 | DP-3 | Nitrate as N | mg/L | 8.3 | 1.0 | 0.68 |
| 3/4/22 | DP-3 | Nitrate Nitrite as N | mg/L | 8.3 | 1.0 | 0.68 |
| 3/4/22 | DP-3 | Oil and Grease | mg/L | ND | | 25 |
| 3/4/22 | DP-3 | Total Suspended Solids (TSS) | mg/L | 93 | | 100 |
| 3/4/22 | DP-3 | pH | SU | 7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/14/21 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 12/14/21 | Chula Vista DP | TSS | mg/L | 3.2 | | 100 |
| 12/14/21 | Chula Vista DP | pH | SU | 7.3 | 6.5 - 8.5 | 6.0 - 9.0 |
| 10/5/21 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 10/5/21 | Chula Vista DP | TSS | mg/L | 23 | | 100 |
| 10/5/21 | Chula Vista DP | pH | SU | 7.6 | 6.5 - 8.5 | 6.0 - 9.0 |
| 1/29/21 | DP-3 | Oil and Grease | mg/L | ND | | 25 |
| 1/29/21 | DP-3 | TSS | mg/L | 21 | | 100 |
| 1/29/21 | DP-3 | pH | SU | 7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/23/19 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/23/19 | DP-1 | TSS | mg/L | 21 | | 100 |
| 12/23/19 | DP-1 | pH | SU | 7.7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 11/29/18 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 11/29/18 | Chula Vista DP | TSS | mg/L | 93 | | 100 |
| 11/29/18 | Chula Vista DP | pH | SU | 7.8 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/28/18 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 2/28/18 | Chula Vista DP | TSS | mg/L | 47 | | 100 |

**Exhibit A: Storm Water Sampling Data from Vulcan Materials Chula Vista Plant**

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 2/28/18 | Chula Vista DP | pH | SU | 7.8 | 6.5 - 8.5 | 6.0 - 9.0 |
| 5/6/16 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 5/6/16 | DP-1 | TSS | mg/L | 4.2 | | 100 |
| 1/4/16 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 1/4/16 | DP-1 | TSS | mg/L | 32 | | 100 |
| 1/4/16 | DP-1 | pH | SU | 6 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/22/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/22/15 | DP-1 | TSS | mg/L | 1.8 | | 100 |
| 12/11/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/11/15 | DP-1 | TSS | mg/L | 6.4 | | 100 |
| 12/11/15 | DP-1 | pH | SU | 6.5 | 6.5 - 8.5 | 6.0 - 9.0 |
| 9/15/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 9/15/15 | DP-1 | TSS | mg/L | 340 | | 100 |
| 9/15/15 | DP-1 | pH | SU | 7.64 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/23/14 | OF-1A | pH | SU | 7.81 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/23/14 | OF-1A | TSS | | 150 | | 100 |
| 2/23/14 | OF-1A | Specific Conductance | umhos/cm | 4500 | | |
| 2/23/14 | OF-1A | Oil and Grease | | ND | | 25 |
| 2/23/14 | OF-1A | Total Organic Carbon | mg/L | 7.7 | | |
| 1/30/13 | OF-1B | Resistivity | ohm cm | 300 | | |
| 1/29/13 | OF-1B | pH | SU | 8.03 | 6.5 - 8.5 | 6.0 - 9.0 |
| 1/28/13 | OF-1B | Specific Conductance | umhos/cm | 3300 | | |
| 1/27/13 | OF-1B | Total Organic Carbon | mg/L | 6.4 | | |
| 1/26/13 | OF-1B | TSS | | 250 | | 100 |
| 1/25/13 | OF-1B | Oil and Grease | | ND | | 25 |
| 12/12/11 | OF-1B | Oil and Grease | mg/L | ND | | 25 |
| 12/12/11 | OF-1B | Nitrate/Nitrite-N | mg/L | 79 | 1.0 | 0.68 |
| 12/12/11 | OF-1B | TSS | mg/L | 570 | | 100 |
| 12/12/11 | OF-1B | Specific Conductance | umhos/cm | 4800 | | |
| 12/12/11 | OF-1B | pH | SU | 8.2 | 6.5 - 8.5 | 6.0 - 9.0 |

**Exhibit A: Storm Water Sampling Data from Vulcan Materials Chula Vista Plant**

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 11/4/11 | OF-1B | Oil and Grease | mg/L | ND | | 25 |
| 11/4/11 | OF-1B | Iron | mg/L | 36 | 0.3 | 1 |
| 11/4/11 | OF-1B | Nitrate/Nitrite-N | mg/L | 67 | 1.0 | 0.68 |
| 11/4/11 | OF-1B | TSS | mg/L | 120 | | 100 |
| 11/4/11 | OF-1B | Specific Conductance | umhos/cm | 4800 | | |
| 11/4/11 | OF-1B | pH | SU | 7.7 | 6.5 - 8.5 | 6.0 - 9.0 |

**Exhibit B: NOAA Precipitation Data for Vulcan Material Chula Vista Plant**

National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station Information:
SAN DIEGO BROWN FIELD, CA US USW00003178
Elev: 521 ft.; Lat: 32.5758° N; Lon: -116.9939° W

| Date | Daily Precipitation (inches) |
|---|---|
| 2/12/2018 | 0.02 |
| 2/14/2018 | 0.06 |
| 2/18/2018 | 0.03 |
| 2/19/2018 | 0.04 |
| 2/23/2018 | 0.02 |
| 2/27/2018 | 0.76 |
| 3/3/2018 | 0.02 |
| 3/10/2018 | 0.39 |
| 3/13/2018 | 0.02 |
| 3/14/2018 | 0.04 |
| 3/15/2018 | 0.13 |
| 3/17/2018 | 0.37 |
| 3/18/2018 | 0.02 |
| 3/22/2018 | 0.03 |
| 3/23/2018 | 0.01 |
| 4/19/2018 | 0.06 |
| 4/30/2018 | 0.01 |
| 5/2/2018 | 0.06 |
| 5/12/2018 | 0.04 |
| 5/20/2018 | 0.01 |
| 5/21/2018 | 0.02 |
| 10/5/2018 | 0.02 |
| 10/12/2018 | 0.09 |
| 11/22/2018 | 0.13 |
| 11/29/2018 | 0.91 |
| 11/30/2018 | 0.14 |
| 12/1/2018 | 0.02 |
| 12/5/2018 | 0.61 |
| 12/6/2018 | 1.07 |
| 12/25/2018 | 0.27 |
| *12/31/2018* | *0.01* |

| Date | Daily Precipitation (inches) |
|---|---|
| 1/5/2019 | 0.11 |
| 1/6/2019 | 0.27 |
| 1/12/2019 | 0.36 |
| 1/14/2019 | 0.52 |
| 1/15/2019 | 0.13 |
| 1/17/2019 | 0.24 |
| 1/18/2019 | 0.01 |
| 1/21/2019 | 0.01 |
| 1/31/2019 | 0.41 |
| 2/1/2019 | 0.01 |
| 2/2/2019 | 1.19 |
| 2/4/2019 | 0.25 |
| 2/5/2019 | 0.26 |
| 2/6/2019 | 0.01 |
| 2/10/2019 | 0.04 |
| 2/13/2019 | 0.51 |
| 2/14/2019 | 1.03 |
| 2/15/2019 | 0.09 |
| 2/16/2019 | 0.02 |
| 2/17/2019 | 0.18 |
| 2/18/2019 | 0.21 |
| 2/20/2019 | 0.41 |
| 2/21/2019 | 0.37 |
| 3/2/2019 | 0.14 |
| 3/3/2019 | 0.01 |
| 3/5/2019 | 0.01 |
| 3/6/2019 | 0.1 |
| 3/7/2019 | 0.03 |
| 3/8/2019 | 0.12 |
| 3/11/2019 | 0.4 |
| 3/12/2019 | 0.04 |
| 3/20/2019 | 0.02 |

**Exhibit B: NOAA Precipitation Data for Vulcan Material Chula Vista Plant**

National Oceanic & Atmospheric Administration

National Environmental Satellite, Data, and Information Service

Record of Climatological Observations

Station Information:

SAN DIEGO BROWN FIELD, CA US USW00003178

Elev: 521 ft.; Lat: 32.5758° N; Lon: -116.9939° W

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 3/21/2019 | 0.05 | 12/7/2019 | 0.16 |
| 4/3/2019 | 0.08 | 12/8/2019 | 0.05 |
| 4/6/2019 | 0.02 | 12/23/2019 | 1.43 |
| 4/16/2019 | 0.03 | 12/24/2019 | 0.34 |
| 4/28/2019 | 0.01 | 12/25/2019 | 0.03 |
| 4/29/2019 | 0.04 | 12/26/2019 | 1.13 |
| 4/30/2019 | 0.11 | 1/9/2020 | 0.07 |
| 5/5/2019 | 0.02 | 1/17/2020 | 0.04 |
| 5/6/2019 | 0.01 | 1/20/2020 | 0.01 |
| 5/10/2019 | 0.02 | 1/21/2020 | 0.19 |
| 5/11/2019 | 0.03 | 2/9/2020 | 0.12 |
| 5/16/2019 | 0.04 | 2/10/2020 | 0.41 |
| 5/19/2019 | 0.38 | 2/22/2020 | 0.25 |
| 5/20/2019 | 0.12 | 2/23/2020 | 0.01 |
| 5/21/2019 | 0.12 | 3/1/2020 | 0.09 |
| 5/22/2019 | 0.12 | 3/2/2020 | 0.05 |
| 5/26/2019 | 0.19 | 3/7/2020 | 0.02 |
| 6/21/2019 | 0.03 | 3/8/2020 | 0.15 |
| 6/24/2019 | 0.01 | 3/9/2020 | 0.15 |
| 9/4/2019 | 0.14 | 3/10/2020 | 0.38 |
| 9/25/2019 | 0.02 | 3/12/2020 | 0.39 |
| 9/27/2019 | 0.02 | 3/13/2020 | 0.3 |
| 11/19/2019 | 0.41 | 3/14/2020 | 0.04 |
| 11/20/2019 | 1.04 | 3/16/2020 | 0.24 |
| 11/21/2019 | 0.62 | 3/17/2020 | 0.2 |
| 11/27/2019 | 0.29 | 3/18/2020 | 0.46 |
| 11/28/2019 | 1.69 | 3/19/2020 | 0.29 |
| 11/29/2019 | 0.26 | 3/22/2020 | 0.03 |
| 11/30/2019 | 0.11 | 3/23/2020 | 0.21 |
| 12/3/2019 | 0.04 | 3/25/2020 | 0.02 |
| 12/4/2019 | 1.61 | 3/26/2020 | 0.06 |
| 12/6/2019 | 0.15 | 3/27/2020 | 0.53 |

**Exhibit B: NOAA Precipitation Data for Vulcan Material Chula Vista Plant**

National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station Information:
SAN DIEGO BROWN FIELD, CA US USW00003178
Elev: 521 ft.; Lat: 32.5758° N; Lon: -116.9939° W

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 4/5/2020 | 0.01 | 3/11/2021 | 0.15 |
| 4/6/2020 | 0.22 | 3/12/2021 | 0.02 |
| 4/7/2020 | 0.64 | 3/13/2021 | 0.04 |
| 4/8/2020 | 0.57 | 3/15/2021 | 0.15 |
| 4/9/2020 | 0.32 | 3/16/2021 | 0.06 |
| 4/10/2020 | 1.51 | 3/23/2021 | 0.01 |
| 4/12/2020 | 0.02 | 3/25/2021 | 0.04 |
| 4/13/2020 | 0.03 | 3/26/2021 | 0.14 |
| 4/18/2020 | 0.04 | 4/21/2021 | 0.01 |
| 6/5/2020 | 0.03 | 4/23/2021 | 0.06 |
| 6/29/2020 | 0.05 | 4/26/2021 | 0.05 |
| 10/25/2020 | 0.12 | 4/27/2021 | 0.01 |
| 11/6/2020 | 0.02 | 5/2/2021 | 0.05 |
| 11/7/2020 | 0.21 | 9/24/2021 | 0.06 |
| 11/8/2020 | 0.21 | 10/4/2021 | 0.44 |
| 12/14/2020 | 0.08 | 10/5/2021 | 0.12 |
| 12/17/2020 | 0.04 | 10/8/2021 | 0.1 |
| 12/24/2020 | 0.01 | 10/25/2021 | 0.27 |
| 12/28/2020 | 0.8 | 12/7/2021 | 0.02 |
| 12/29/2020 | 0.03 | 12/9/2021 | 0.39 |
| 1/20/2021 | 0.02 | 12/14/2021 | 1.07 |
| 1/21/2021 | 0.01 | 12/16/2021 | 0.01 |
| 1/22/2021 | 0.01 | 12/23/2021 | 0.52 |
| 1/23/2021 | 0.42 | 12/24/2021 | 0.34 |
| 1/24/2021 | 0.2 | 12/25/2021 | 0.21 |
| 1/25/2021 | 0.32 | 12/26/2021 | 0.27 |
| 1/29/2021 | 1.11 | 12/27/2021 | 0.1 |
| 2/12/2021 | 0.03 | 12/28/2021 | 0.4 |
| 2/13/2021 | 0.02 | 12/29/2021 | 0.12 |
| 2/16/2021 | 0.19 | 12/31/2021 | 0.02 |
| 3/3/2021 | 0.77 | 1/15/2022 | 0.04 |
| 3/10/2021 | 0.62 | 1/17/2022 | 0.27 |

**Exhibit B: NOAA Precipitation Data for Vulcan Material Chula Vista Plant**
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station Information:
SAN DIEGO BROWN FIELD, CA US USW00003178
Elev: 521 ft.; Lat: 32.5758° N; Lon: -116.9939° W

| Date | Daily Precipitation (inches) |
|---|---|
| 1/18/2022 | 0.19 |
| 2/15/2022 | 0.19 |
| 2/16/2022 | 0.23 |
| 2/21/2022 | 0.04 |
| 2/22/2022 | 0.54 |
| 2/23/2022 | 0.33 |
| 3/4/2022 | 0.84 |
| 3/5/2022 | 0.02 |
| 3/19/2022 | 0.02 |
| 3/20/2022 | 0.27 |
| 3/28/2022 | 1.19 |
| 3/29/2022 | 0.66 |
| 4/2/2022 | 0.01 |
| 4/3/2022 | 0.03 |
| 4/11/2022 | 0.16 |
| 4/21/2022 | 0.01 |
| 4/22/2022 | 0.16 |
| 5/20/2022 | 0.01 |
| 9/9/2022 | 0.27 |
| 9/11/2022 | 0.01 |
| 10/6/2022 | 0.02 |
| 10/11/2022 | 0.04 |
| 10/22/2022 | 0.09 |
| 10/23/2022 | 0.03 |
| 11/2/2022 | 0.05 |
| 11/3/2022 | 0.07 |
| 11/7/2022 | 0.01 |
| 11/8/2022 | 2.17 |
| 11/9/2022 | 0.1 |
| 11/29/2022 | 0.01 |
| 12/5/2022 | 0.01 |
| 12/11/2022 | 0.62 |

| Date | Daily Precipitation (inches) |
|---|---|
| 12/12/2022 | 0.04 |
| 12/27/2022 | 0.1 |
| 12/28/2022 | 0.49 |
| 12/31/2022 | 0.01 |
| | |
| | |
| | |

February 27, 2023

**VIA CERTIFIED MAIL**                        **VIA U.S. MAIL:**
**RETURN RECEIPT REQUESTED:**

                                              CT Corporation System
Steve Hallmark                                Registered Agent for Service of Process
Plant Manager                                 CALMAT CO.
CHULA VISTA PLANT                             330 N. Brand Blvd Suite 700
2275 Hard Rock Road                           Glendale, CA 91203
Chula Vista, CA 91913

                                              CT Corporation System
CalMat Co dba                                 Registered Agent for Service of Process
Vulcan Materials Co Western Div.              VULCAN MATERIALS COMPANY
500 N. Brand Boulevard                        330 N. Brand Blvd Suite 700
Glendale, California 91203                     Glendale, CA 91203


Re:      **Notice of Violation and Intent to File Suit under the Clean Water Act**

To the Above-Listed Recipients:

San Diego Coastkeeper ("SDCK" or "Coastkeeper") is a non-profit organization dedicated to the health of California's marine and freshwater ecosystems and the communities dependent on them. SDCK has a long history of taking action to protect the resources of San Diego county, and it has come to our attention that CalMat Co. dba Vulcan Materials Co. Western Division (collectively "Chula Vista Plant Owners and Operators") are in ongoing violation of the Clean Water Act[1] and California's Statewide General Permit for Storm Water Discharges Associated with Industrial Activities[2] ("Storm Water Permit") at 2041 Heritage Road, Chula Vista, CA 91913, or alternatively 2275 Hard Rock Road, Chula Vista, California 91911 (the "Facility" or "Chula Vista Plant").

Violations of the terms and conditions of the Storm Water Permit are violations of the Clean Water Act. SDCK is sending this notice letter ("Notice Letter")[3] pursuant to 33 U.S.C.

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ ("Storm Water Permit"), and amended by Order No. 2015-0122–DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit") (collectively "Storm Water Permit").
[3] A certified copy of a previous version of this letter was mailed to the Plant Manager at the Facility 2041 at Heritage Road, Chula Vista, California 91913, but it was returned as undeliverable. SDCK is mailing this updated

§§ 1365(a) and (b) of the Clean Water Act, and with it is notifying you of its intent to pursue enforcement against the Chula Vista Plant Owners and Operators for the violations identified in this Notice Letter.[4]

## I.      BACKGROUND

### A.      Storm Water Pollution and the Waters Receiving Discharges from the Facility

With every significant rainfall event millions of gallons of polluted storm water originating from industrial properties such as the Facility pour into storm drains and waterways. The consensus among agencies and water quality specialists is that *storm water pollution accounts for more than 50% of the total pollution entering surface waters each year*. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. As the Clean Water Act requires, these contaminated discharges can and must be controlled for the ecosystem to regain its health.

Information available to Coastkeeper indicates that polluted discharges from the Facility contain pH affecting substances; metals, such as iron, aluminum, copper, and zinc; nitrogen, nitrite and nitrate ("N+N"); total suspended solids ("TSS") and dissolved solids; trash; oil and grease ("O&G"), and others. These polluted discharges adversely impact humans and the environment.

Copper and zinc, regulated by the California Toxics Rule ("CTR"), are known to be toxic to aquatic life. (40 C.F.R. § 131.38 *et seq*.). Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish. Benthic macroinvertebrates are critical components of aquatic ecosystems and the food chain. Heavy metals are deleterious to this benthic community. Although the effects are compounded with different factors such as altitude, temperature, stream width, turbidity, the influence of heavy metals on benthic macroinvertebrate communities was clearly established, and includes reduced species richness, reduced abundance, and a shift in community composition from sensitive to tolerant taxa. The negative effects of heavy metals on benthic communities, and bioaccumulation in fish also negatively impacts birds and other fauna, which depend on them for survival.

---

version of this letter to the addresses above out of an abundance of caution even though counsel for the Chula Vista Plant Owners and Operators has already contacted SDCK acknowledging receipt of the previous letter.

[4] Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of their intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. 40 C.F.R. § 135.2(a)(1).

High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can also clog fish gills and interfere with respiration in aquatic fauna." Basin Plan at 3-31.

"Many pollutants can alter the pH, raising or lowering it excessively. In some cases even small changes in pH can harm aquatic biota. The pH changes can alter the chemical form of certain constituents, thereby increasing their bioavailability and toxicity. For example, a decrease in pH can result in an increase in dissolved metal concentrations." *Id*. at 3-5. Oil and grease can create surface films and can result in nuisance conditions because of offensive odors and visual impacts. Oil and grease can also coat birds and aquatic organisms, adversely affecting respiration and/or thermoregulation.

The Otay River is a water of the United States and flows to San Diego Bay and the Pacific Ocean, both of which are navigable-in-fact waterbodies.[5] Monthly in-stream receiving water monitoring data reported in the California Environmental Data Exchange Network ("CEDEN"), and used for the 2020/2022 California Integrated Report including the 2020/2022 303(d) List of Impaired Water Bodies, establishes flow in the Otay River during the vast majority of months from 2009-2018.[6] Most samples were collected during dry weather conditions. Coastkeeper staff, volunteers, and other representatives have also frequently observed the Otay River flowing during various months of the year.

The San Diego Regional Water Quality Control Board ("Regional Board") has identified numerous "Beneficial Uses" of water bodies in the San Diego Region. The existing and potential Beneficial Uses for Otay River identified in the region's 2021 Water Quality Control Plan ("Basin Plan") include: agricultural supply; industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; and rare, threatened, or endangered species.[7] The existing and potential Beneficial Uses for San Diego Bay identified in the region's Basin Plan include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sports fishing; preservation of biological habitats of special significance; estuarine habitat; wildlife habitat; rare, threatened, or endangered species; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; and shellfish harvesting.

According to the 2020/2022 303(d) List, the Otay River is impaired for copper, zinc,

---

[5] The Otay River, San Diego Bay, and Pacific Ocean hereinafter collectively referred to as "Receiving Waters."
[6] Data publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool.
[7] 2021 Water Quality Control Plan for the Central Coastal Basin – *available at* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/.

toxicity, dissolved oxygen, nitrogen, phosphorus, benthic community effects, total dissolved solids ("TDS"), Pyrethroids, Bifenthrin, and Cyfluthrin. According to the 2020/2022  303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs").[8] Other parts of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

The Receiving Waters into which storm water runoff from the Chula Vista Plant flows are ecologically sensitive areas. The Otay River and portions of San Diego Bay provide critical migrating waterfowl habitat, nesting sites for sensitive bird species, and generally protect a tremendous diversity of plant and animal species. For example, the Otay River Valley is a critical and unique wildlife corridor, as it is one of the last open green spaces connecting San Diego's eastern mountain ranges all the way to San Diego Bay. It is home to coyotes, grey foxes, raccoons, desert cottontails, and American badgers. According to the City of Chula Vista, over 200 bird species utilize the Otay River Valley including the great blue heron, snowy egret, white-tailed kite, northern harrier, red-tailed hawk, coots, ducks, and endangered birds such as Least Bell's Vireo and southwestern willow flycatcher.[9]

Furthermore, the Otay River empties directly into the San Diego Bay National Wildlife Refuge ("SDBNWR"), a 2,300-acre protected refuge managed by the U.S. National Fish and Wildlife Service at the southern end of San Diego Bay.[10] SDBNWR is a coastal salt marsh and intertidal mudflat habitat which is home to a diversity of endangered, threatened, migratory, and native species, including a population of green sea turtles. As over ninety percent of the historic wetlands of San Diego Bay have been filled in, drained, or diked, this refuge provides critical habitat for hundreds of thousands of birds migrating along the Pacific Flyway, as well as for the bay's resident species.

As further explained above, pollutants discharged from the Chula Vista Plant are deleterious to local vegetation, invertebrates, insects, fish, birds, and other animals in and around the Receiving Waters. As such, these pollutant discharges strain the ecosystems on which numerous species, some of which are endangered, depend for survival, and negatively impact the public's, and Coastkeeper's members', ability to use and enjoy Receiving Waters.

## B.     The Facility's Storm Water Permit Coverage

Certain facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board"). (*See* Storm Water Permit,

---

[8] 2020/2022 Integrated Report – All Assessed Waters, https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2020_2022_integrated_report.html.
[9] Otay Valley Regional Park Brochure, https://www.chulavistaca.gov/home/showdocument?id=8405.
[10] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *About the Refuge*, https://www.fws.gov/refuge/San_Diego_Bay/about.html.

Finding #12.) Information available to Coastkeeper indicates the Facility first obtained Storm Water Permit coverage on February 11, 2011, under Waste Discharge Identification ("WDID") number as 9 37I023019. The Facility Owners and Operators most recently submitted an NOI on April 28, 2022 ("2022 NOI"), and as such the Facility remains covered by the Storm Water Permit. The 2022 NOI identifies the owner/operator of the Facility as "CalMat Co dba Vulcan Materials Western Division" and the Facility name and location as "Chula Vista Plant, 2041 Heritage Road, Chula Vista, CA 91913." The 2022 NOI lists the Facility as 128 acres in size, all of which is exposed to storm water, and the percentage of impervious surface is not listed. The Facility's most recent Storm Water Prevention Pollution Plan ("SWPPP"), dated May 15, 2017 ("2017 SWPPP"), states less than one percent of the Facility is impervious.

The NOI lists the Standard Industrial Classification ("SIC") code for the Facility is 1429 (Crushed and Broken Stone, NEC). SIC code 1429 facilities must obtain Storm Water Permit coverage for the entire facility. (*See* Storm Water Permit, Attachment A, ¶ 3.) Information available to Coastkeeper indicates that SIC code 1442 (Construction Sand and Gravel) also applies to the Facility. SIC Code 1442 applies to facilities operating sand and gravel pits and dredges, and in washing, screening, or otherwise preparing sand and gravel for construction uses. The 2017 SWPPP states the "Facility is an active mining operation where various rock products are produced for consumption by the local construction industry." (2017 SWPPP, § 2.1.2). The Facility's website further explains that it is a "supplier and distributor of construction materials" offering "construction aggregates, including gravel, sand and crushed stone."[11] Hence, SIC code 1442 also applies to the Facility.

### C.      Chula Vista Plant Owners and Operators' Liability for Violations

Information available to Coastkeeper, including the Facility's NOIs, indicates that CalMat Co. is an owner and/or operator of the Facility and has been since on or around November 2011. CalMat Co. is an active Delaware corporation organized in Delaware.

Information available to Coastkeeper, including the Facility's NOIs and SWPPPs, indicates that Vulcan Materials Company is an owner and/or operator of the Facility and has been since on or about November 2011. Vulcan Materials Company is an active Virginia corporation organized in New Jersey.

As this letter describes in detail, storm water discharging from the Facility consists of storm water associated with industrial activity and includes heavy metals and other contaminants, and therefore contains "pollutants," as defined by Clean Water Act Section 502(6), 33 U.S.C. § 1362(6). The Receiving Waters are "waters of the United States" within the meaning of Clean Water Act Section 502(7), 33 U.S.C. § 1362(7) and implementing regulations. Accordingly, the Chula Vista Plant Owners and Operators' discharge of storm water into waters of the United States constitutes a "discharge of pollutants" within the meaning of Clean Water Act Section 502(12), 33 U.S.C. § 1362(12). Further, as the owners and operators of the Facility,

---

[11] https://www.vulcanmaterials.com/construction-materials/facilities/chula-vista-stone.

the Chula Vista Plant Owners and Operators are responsible for complying with the procedural and substantive requirements of the Storm Water Permit, which as explained below they have failed to do. Accordingly, the Chula Vista Plant Owners and Operators are liable for violations of the Storm Water Permit and the Clean Water Act.

### D.      San Diego Coastkeeper

Coastkeeper is a 501(c)(3) environmental, non-profit public benefit corporation in accordance with the laws of the State of California. Using law, policy, and science, Coastkeeper advances policies and programs in the San Diego area to protect and enhance clean and abundant waters throughout southern California for the benefit of Californians and California ecosystems. Additionally, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, initiates enforcement actions on behalf of itself and its members. Coastkeeper's offices are located at 8305 Vickers St. Suite 209 San Diego CA 92111. Coastkeeper and its individual and organizational members throughout the state of California have an interest in the preservation and use of waters statewide, including the Otay River, San Diego Bay, and Pacific Ocean.

As explained above, the Chula Vista Plant Owners and Operators discharge pollutants into the Otay River, which flows downstream into San Diego Bay. The Otay River and San Diego Bay have special aesthetic and recreational significance for Plaintiffs' members and the public. Otay Valley Regional Park includes several miles of hiking, biking, and equestrian riding along the Otay River in a natural environment.[12] The San Diego Bay National Wildlife Refuge is also publicly accessible and includes pedestrian and bike trails used not only for physical outdoor recreation, but also for birding and wildlife viewing as they include "interpretive panels to enhance visitors' experience on the trail with information related to migratory birds, [and] salt marsh restoration."[13]

Given the Otay River's and San Diego Bay's ecological importance and aesthetic and recreational significance, Coastkeeper's members use and enjoy these Receiving Waters for numerous activities. They frequently use various areas downstream from the Chula Vista Facilities for hiking, biking, enjoyment of natural open spaces, general aesthetic enjoyment, bird watching, and observation of other fauna including butterflies, and various fish, reptiles, and mammals. Coastkeeper and its members have conducted restoration and conservation activities including cleanups, invasive species removal, and native species planting, in multiple downstream locations. Coastkeeper and its members regularly lead ecological and educational tours in downstream Receiving Waters, including birdwatching tours and kayaking tours, educating members of the public about various flora, fauna, and ecosystems. Coastkeeper and its members also use these waters to engage in scientific study through pollution and habitat

---

[12] Otay Valley Regional Park Brochure.
[13] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *New Bayside Birding & Walking Trail Provides Enhanced Access to San Diego Bay NWR*, https://www.fws.gov/refuge/san_diego_bay/New_Birding_Trail.aspx.

monitoring, including water quality sampling and assessment. Coastkeeper and its members plan to continue enjoying all of the aforementioned activities.

Pollution and contamination discharged from the Chula Vista Facilities harms the aesthetic, educational, scientific, and recreational experiences of Coastkeeper's members. Coastkeeper and its members are aware of the pollution concerns discussed herein, and based on these concerns avoid touching, swimming, fishing, and engaging in other activities in Receiving Waters when they would otherwise like to. Coastkeeper and its members have a vested interest in protecting and enjoying healthy ecosystems and thriving natural flora and fauna populations. As polluted discharges from the Chula Vista Facilities are deleterious to local vegetation, invertebrates, insects, fish, birds, and other animals, Coastkeeper and its members' enjoyment of downstream ecosystems, flora, and fauna is negatively impacted by Defendant's polluted discharges. Thus, the interests of SDCK's members have been, are being, and will continue to be adversely affected by Chula Vista Plant Owners and Operators' failure to comply with the Clean Water Act and the Storm Water Permit.

## II. THE FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A. The Facility Site Description and Industrial Activities

The "Facility is an active mining operation where various rock products are produced for consumption by the local construction industry." (2017 SWPPP, § 2.1.2). The Facility's website further explains that it is a "supplier and distributor of construction materials" offering "construction aggregates, including gravel, sand and crushed stone  for use in building bridges, parking lots, roads, airport runways, houses, apartments, schools, commercial building, and more."[14]

According to the 2017 SWPPP, industrial activities at the Facility include aggregate mining in an open pit, drilling, and blasting; aggregate crushing, screening, washing, and conveyance; aggregate stockpiling and storage; material loading and delivery; and vehicle and equipment washing, maintenance, and fueling. Associated equipment structures include crushers, screens, a wash plant, conveyors, steel beams, conveyor belts, electrical panels, associated wiring, and large off-road trucks and vehicles.

According to documents obtained from the City of Chula Vista and the San Diego Regional Water Quality Control Board ("Regional Board"), Vulcan is constructing a new aggregate processing plant at the Facility. Vulcan enrolled under the California Construction General Stormwater Permit ("CGP") on March 18, 2020 for construction activities related to this new processing plant under WDID 9 37C389786. The Facility's CGP coverage remains active. The new plant will include a primary plant (jaw crusher), secondary plant (crusher and screen), finishing plant (multiple crushers and screens), and wet and dry processing plants. Phase I of new project will add 5500 square feet of impervious surface as "foundations for screening

---

[14] https://www.vulcanmaterials.com/construction-materials/facilities/chula-vista-stone.

towers." The processing plant will be located adjacent to the Otay River, with the potential to discharge directly into the river.

According to the 2017 SWPPP, materials used or generated at the Facility that have potential to be released with stormwater include: various sized aggregate materials; fuels, oils, solvents, detergents, flocculent, foam, and "various other hazardous materials"[15]; runoff from aggregate stockpiles and equipment stored outdoors; and wash products such as wash wastewater.

Information available to Coastkeeper indicates that obsolete machinery, oil drums, and other materials are stored outside; tanks and chemical containers, including diesel fuel, lube oils, and antifreeze, are stored in a Maintenance Area; and industrial activities occur within all drainage areas of the Facility, without adequate cover or containment, many of which result in discharges of polluted storm water.

## B.   Pollutants and Pollutant Sources Related to or Arising Out of the Facility's Industrial Activities

Virtually all of the industrial activities and materials described supra are exposed to storm water. The 2017 SWPPP acknowledges that all of the following industrial activities and materials can contribute to the Facility's storm water pollution: all quarry activities and the entire quarry area; outdoor material and aggregate storage; hazardous materials; storage tanks and drums containing used oil, new lubricating oil, used antifreeze drums, and various other hazardous materials; vehicle and equipment washing, maintenance, fueling; rock washing; and material loading, crushing, and sorting. However, the 2017 SWPPP states that the only pollutants associated with all of these Facility's industrial activities and materials are TSS, and various oils and petroleum products.

Information available to Coaskeeper indicates that pollutants associated with industrial activities and materials at the Facility further include but are not limited to: pH affecting substances; metals, such as iron, aluminum, copper, and zinc; nitrogen, N+N; total suspended solids TSS; TDS; trash; oil and grease O&G, and others. The Facility's own storm water sampling results from 2011 showed extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS. (Exhibit A). The Facility's most recent sample, dated March 4, 2022, tested the Facility's N+N concentration for the first time since at least 2015. Unsurprisingly, this sample revealed a N+N concentration of 8.3 mg/L, over twelve times the EPA Benchmark for N+N of 0.68 mg/L. (*Id.*)

The EPA Industrial Stormwater factsheet for mineral mining and processing facilities indicates that pollutants associated with material handling and storage, equipment maintenance and cleaning, industrial processing or other operations include dust, TSS, TDS, fines, pH

---

[15] *See* 2017 SWPPP, Table 2.1.b.

affecting substances, diesel, fuel, other oils, heavy metals, solvents, acids, arsenic, lead, cadmium, chromium, benzene, TCA, TCE, and PAHs.

The Facility also operates heavy machinery and trucks, which are associated with metals such as aluminum, copper, and zinc. Not only is metal equipment operated and metal parts stored throughout the Facility, but copper in brake pads, and zinc in tires of heavy industrial trucks used to haul rocks aggregate around and on/off the Facility, are likely pollutant sources.

On multiple occasions, including on January 29, 2021, June 25, 2022, and July 11, 2022 Coastkeeper representatives have observed and photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River. Numerous Chula Vista MS4 inlets line Main Street, all of which discharge directly into the Otay River.

## C.   Facility Storm Water Flow and Discharge Locations

According to the Facility SWPPP, the Facility is composed of 12 drainage areas. Although the Facility has two retention ponds from which the SWPPP claims stormwater discharges are not expected, several drainage areas discharge into the Otay River, most of which have no retention capacity. As noted in the 2017 SWPPP, "[t]he Otay River is bounded by a vegetated berm (Otay River Berm). There are several pipe transects along the Otay River Berm which direct runoff through the berm directly into Otay River. These pipe transects allow discharge from the Chula Vista Quarry into the Otay River."

According to the SWPPP, Drainage Area 1 (DA-1) includes the main entrance, main office and parking area, weigh station, maintenance shop, and bulk oil storage. Information available to Coastkeeper indicates that all vehicles, including intensive materials delivery trucks traffic, pass through DA-1. According to the SWPPP, "[s]tormwater within the drainage area is directed towards the Otay River Berm and is contained within this area." However, DA-1 lacks any retention capacity, and the SWPPP fails to identify any BMPs that would prevent stormwater from discharging from DA-1. Information available to Coastkeeper indicates stormwater will flow either west toward the Facility entrance and ultimately into the Otay River, or east into Drainage Area 2 (DA-2) where it will discharge into the Otay River at DP-1.

According to the SWPPP, DA-2 includes a portion of an onsite access road and aggregate storage stockpiles near the entrance. Information available to Coastkeeper also indicates that extensive truck traffic passes through DA-2. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-1."

According to the SWPPP, Drainage Area 3 (DA-3) is a large area in the southern portion of the Facility with numerous access roads and aggregate storage stockpiles, and an elevated water tower which supplies water trucks for dust control. Information available to Coastkeeper, including publicly available satellite imagery, also shows vehicles and large processing

equipment in this area. DA-3 is the largest drainage area immediately adjacent to the Otay River. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-3."

According to the SWPPP, Drainage Area 4 (DA-4) contains access roads, aggregate storage stockpiles and an aggregate loading area. According to the SWPPP, "[s]torm water falling in this area collects within this flat area and eventually overflows to either Drainage Area 3 or 5 during a large storm event." However, DA-4 lacks any retention capacity, and the SWPPP fails to identify any BMPs that would prevent from discharging from DA-1.4

According to the SWPPP, Drainage Area 5 (DA-5) includes access roads and aggregate storage stockpiles. Information available to Coastkeeper, including publicly available satellite imagery, also shows extensive vehicles and equipment in this area. "Storm water in this area is directed towards the berm along the Otay River and outfalls through a pipe that transects the berm at DP-4."

According to the SWPPP, Drainage Area 6 (DA-6) includes access roads, aggregate storage stockpiles, and an aggregate loading area, and that storm water overflows from DA-6 to DA-5 during a large storm event. However, information available to Coastkeeper, including the Facility SWPPP's own flow lines, and satellite imaging, indicate that flows from DA-6 will discharge from DA-6's eastern boundary into natural open space.

According to the SWPPP, Drainage Area 7 (DA-7) includes access roads, aggregate storage stockpiles, shop boneyards, a portion of the material sorting plant. "Surface flows are directed into Sedimentation Basin 1. Discharge from Basin 1 is directed into a vertical riser which drains south through a 12" pipe and into the Otay River at DP-2."

According to the SWPPP, Drainage Area 8 (DA-8) includes the aggregate washing facility and washed aggregate stockpiles. The SWPPP states that captured fines are recovered and used as topsoil mixture, but fails to describe how or where. The SWPPP further states that wash discharge water is directed to Retention Pond 3, and that overflow of the basin is directed via an underground pipe conduit to the pit in Drainage Area 9 (DA-9).

According to the SWPPP, DA-9 includes the active mining area, aggregate processing, and vehicular travel. Storm water will pond in the mining pit.

According to the SWPPP, Drainage Area 10 (DA-10) includes access roads and aggregate storage stockpiles, and drainage is directed to the southeast corner of the drainage area, and that overflow from DA-10 is directed to Drainage Area 11 (DA-11). Information available to Coastkeeper, including satellite imaging, indicates that mining activities may also be occurring in DA-10, and that the footprint of industrial activities in DA-10 is significantly larger than represented on the Facility's site map. This information further indicates that northeastern portion of the Facility has vastly different drainage patterns, and likely discharges into natural open space to the north and east of the Facility, and thereafter down a steep grade to the nearby Otay River.

According to the SWPPP, DA-11 and Drainage Area 12 (DA-12) both include access roads and aggregate storage stockpiles, and that drainage from DA-11 is directed southeast into DA-12, and that DA-12 eventually discharges in DA-8. However, the flow and topographical lines on the Facility's own site map indicate that that DA-11 discharges to the east into open space, and DA-12 discharges to the south into open space, both of which thereafter flow down a steep grade to the nearby Otay River. Further, information available to Coastkeeper, including satellite imaging, indicates that the industrial activities, drainage, and flow patterns significantly differ from the 2017 SWPPP and site map.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person that discharges storm water associated with industrial activity must comply with the terms of the Storm Water Permit. (*See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* Storm Water Permit, Fact Sheet at VII.) The Storm Water Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations;[16] (2) SWPPP requirements; and (3) self-monitoring and reporting requirements. In addition, facility owners and operators must submit Exceedance Response Action Plans ("ERA Report") outlining effective plans to reduce pollutants if sampling at the facility indicates a pollutant above the Numeric Action Level ("NAL").[17] Facility owners and operators must strictly comply with all the terms and conditions of the Storm Water Permit. Specific violations of the Storm Water Permit and the Clean Water Act occurring at Chula Vista Plant are described below.

### A.    Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitations

Effluent Limitation V.A. of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic[18] and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[19] The United States EPA has established Benchmarks – levels of pollutants in storm water discharges – that provide objective measure of

---

[16] On November 6, 2018, the State Water Board amended the General Permit ("2018 Amendment") to incorporate, among other requirements, Numeric Effluent Limitations ("NELs") for selected parameters. These new requirements became effective on July 1, 2020. (2018 Amendment, Attachment E.) Any exceedances of an NEL following July 1, 2020, are now per se violations of the Storm Water Permit and Clean Water Act.

[17] An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Storm Water Permit, Section XII.A.)

[18] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, benzene, arsenic, lead, and zinc, among others.

[19] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, total suspended solids, oil and grease, pH, and fecal coliform.

whether the BMPs implemented at a facility are achieving BAT/BCT standard.[20] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[21] Likewise, the Storm Water Permit has developed Numeric Action Levels, which are set at levels indicative of whether BMPs need improvement to comply with the BAT/BCT standards of the Clean Water Act.

Information available to Coastkeeper, including its review of publicly available information and observations, indicate that BMPs that achieve BAT/BCT have not been implemented at the Facility. For example, the Facility's self-reported storm water monitoring data indicates the Facility has discharged and continues to discharge pollutant levels above EPA Benchmarks and the Storm Water Permit's Numeric Action Levels. As noted in Section II.B, *supra*, the Facility has sampled almost exclusively for the minimum parameters of TSS, O&G, and pH for at least the past five years. The Facility's most recent sample, collected on March 4, 2022, tested the Facility's N+N concentration for the first time since at least 2015. This sample reflected a concentration of 8.3 mg/L for N+N, over twelve times the applicable EPA Benchmark and Numeric Action Limit of 0.68 mg/L. (Exhibit A). Further, the Facility's own storm water sampling results from 2011 evidenced extremely high levels of iron, N+N, and specific conductance, which is correlated with TDS, strongly indicating that these pollutants are associated with the Facility's industrial activities and materials and present in the Facility's discharges despite Vulcan's failure to sample for such parameters. (*Id.*)

Additionally, as further described in Section III.E.2, *infra*, the Facility regularly collects samples from only one of the Facility's discharge locations during each during each sampling event, despite the Facility having numerous discharge locations, many of which have no retention capacity, and will thus discharge during most QSEs. Vulcan may not avoid its responsibility to comply with BAT/BCT requirements by violating the Storm Water Permit's sampling requirements.

Further, on multiple occasions, including on January, 29, 2021, June 25, 2022, and July 11, 2022 Coastkeeper representatives have observed and photographed extensive sediment and fine particulate trackout from the Facility's entrance located at the intersection of Hard Rock Road and Main Street. On each occasion, this trackout extended across the Otay River via a bridge on Heritage Road, and along Main Street heading west, which runs immediately adjacent to the northern boundary of the Otay River.

The Facility's own storm water monitoring data, as well as its consistent failure to prevent extensive pollutant trackout, demonstrate that the Chula Vista Plant Owners and Operators have failed and continue to fail to develop and/or implement BMPs at the Facility

---

[20] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP)*, as modified effective February 19, 2021 ("Multi-Sector Permit"); *see also*, 86 Federal Register 10269 (February 19, 2021).
[21] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

necessary achieve compliance with the BAT/BCT standards.[22] The failure to develop and implement BMPs that achieve BAT/BCT as required by Effluent Limitation V.A. of the Storm Water Permit is a daily and ongoing violation that will continue until the BMPs at the Facility are improved to meet the required standard.

Coastkeeper puts Chula Vista Plant Owners and Operators on notice that, as a result of their failure to develop and implement BMPs that achieve BAT/BCT, Storm Water Permit Effluent Limitation V.A. has been and will continue to be violated each time storm water discharges from the Facility. Exhibit B contains a historical record of precipitation recorded at the Brown Field Municipal Airport since June 2017.[23] The weather station at the Brown Field Municipal Airport is about one (1) mile south of the Facility. The Brown Field Municipal Airport reported rainfall on every day that the Facility collected a sample of their storm water discharge. Coastkeeper believes Brown Field Municipal Airport to be the closest available approximation of historical rainfall at the Facility. Accordingly, at a minimum, on each of the dates identified in Exhibit B storm water discharged from the Chula Vista Plant in violation of Effluent Limitation V.A. of the Storm Water Permit and in violation of the Clean Water Act. These violations of Effluent Limitation V.A. are ongoing and will continue every time Chula Vista Plant Owners and Operators discharge polluted storm water from the Facility without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Coastkeeper will update the dates of violations when additional information and data become available.

Each time Chula Vista Plant Owners and Operators discharge polluted storm water in violation of Effluent Limitation V.A. of the Storm Water Permit is a separate and distinct violation Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Further, each day the Chula Vista Plant Owners and Operators have failed and continue to fail to develop and implement BAT and BCT at the Facility is a violation of the Effluent Limitation V.A. of the Storm Water Permit and the Clean Water Act. These violations are ongoing and continuous. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least February 27, 2018.

### B. Discharges of Polluted Storm Water in Violation of Storm Water Permit Receiving Water Limitations

Receiving Water Limitation VI.A. of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS") in any affected receiving water.[24] Discharges

---

[22] *Id.* at 921-25.

[23] The rainfall data was collected from the National Oceanic and Atmospheric Administration ("NOAA") National Centers for Environmental Information's "Daily Summaries" function, accessible at https://www.ncdc.noaa.gov/cdo-web/datasets/GHCND/stations/GHCND:USW00023277/detail (last visited October 29, 2021).

[24] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40

that contain pollutants in excess of applicable WQSs violate the Storm Water Permit Receiving Water Limitations. Further, Receiving Water Limitation VI.B. of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitations.

That Facility's most recent sample, collected on March 4, 2022, which is also the only sample analyzed for N+N since at least 2015, reveal an N+N concentration of 8.3 mg/L, over eight times the San Diego Basin Plan Water Quality Objective for nitrogen of 1.0 mg/L. The Otay River is impaired for nitrogen. As such, the Facility causes or contributes to the Otay River's nitrogen impairment in violation of Receiving Water Limitation VI.A.

Information available to Coastkeeper indicate the Facility routinely discharges various sediments, particulates, aggregates, dirt, mud, and other various other solids in excess of applicable WQSs. For example, the Facility's stormwater samples from 2011 evidence extremely high levels of specific conductance, indicating the Facility also likely discharges high levels TDS in violation of Receiving Water Limitations. The trackout of fine particulates via the access road further indicate the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality Objectives. The Facility's failure to sample for all required parameters, as explained further in Section II.E.2, *infra*, does not excuse Vulcan's Receiving Water Limitations obligations under the Permit.

The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."[25] "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development."[26] High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability.[27] Agricultural supply is a designated beneficial use of the lower segment of the Otay River. Receiving water monitoring data indicates the Otay River is impaired for TDS. As such, the Facility's polluted discharges cause and/or contribute to the Otay River's TDS, and benthic community effects impairments.

The Basin Plan is an applicable WQSs under the Storm Water Permit. Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable

C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999). The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."
[25] Basin Plan at 3-32.
[26] *Id*. at 3-31.
[27] *Id*. at 3-32.

WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Storm Water Permit. Storm Water Permit, Section VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Storm Water Permit Receiving Water Limitations. *See* Storm Water Permit, Section VI.B.

Receiving Water Limitations are violated each time storm water discharges from the Facility containing concentrations of pollutants that exceed the Basin Plan or other applicable water quality standards. Accordingly, at a minimum, on each of the dates identified in Exhibit B, storm water discharged from the Chula Vista Plant violates Receiving Water Limitations VI.A–B of the Storm Water Permit and the Clean Water Act. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS or adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.A. and Receiving Water Limitation VI.B. of the Storm Water Permit and of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).[28] These violations are ongoing and continuous. Coastkeeper will update the dates of violation when additional information and data becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least February 27, 2018.

### C.   Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions

Discharge Prohibition III.B of the Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. (Storm Water Permit, Discharge Prohibition III.B.)

Information available to Coastkeeper indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, the Facility handles and uses large quantities of fuel, used oil, new lubricating oil, used antifreeze, foam, and various other hazardous materials. Moreover, the Facility utilizes large quantities of water for rock washing and dust suppression. Unfortunately, this wash and dust suppression water is tracked throughout the facility, and off the facility as evidenced by the persistent and extensive trackout emanating from the Facility's ingress/egress driveway. Such trackout and discharges of spilled materials, mud, sediments, and/or comingled NSWD violate Discharge Prohibitions III.B of the Permit.

These discharge violations are ongoing and will continue until Chula Vista Plant Owners and Operators develops and implements adequate BMPs that prevent non-storm water discharges

---

[28] Receiving Water Limitations are independent Storm Water Permit requirements that must be complied with, and thus, even if Facility Owners and Operators submit any Exceedance Response Action Plan(s) pursuant to Section XII of the Storm Water Permit, the violations of the Receiving Water Limitations described in this Notice Letter are ongoing.

or obtain separate NPDES permit coverage for these discharges. Each time Chula Vista Plant Owners and Operators discharge prohibited non-storm water in violation of Prohibition III.B of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Coastkeeper will update the number and dates of violations when additional information becomes available. The Chula Vista Plant Owners and Operators are therefore subject to civil penalties for violating the Clean Water Act each time non-storm water discharges from the Facility since at least February 27, 2018.

### D.   Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. The specific SWPPP requirements of the Storm Water Permit, and the Chula Vista Plant Owners and Operators' violations of them, are set forth below.

### 1.   Storm Water Permit SWPPP Requirements

Sections X.A-H of the Storm Water Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the Storm Water Permit. *See also* Storm Water Permit, Appendix 1.) The objectives of the SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to develop and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. (*See* Storm Water Permit, Section X.C.)

The SWPPP must include, among other things, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the Storm Water Permit; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a monitoring implementation plan; annual comprehensive facility compliance evaluation; the date that the SWPPP was initially prepared and the date of each SWPPP amendment; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.A-H.)

Further, the Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. (Storm Water Permit, Section X.A-B.) The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual

observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. (Storm Water Permit, Sections X.B and XV.)

2.    The Chula Vista Plant Owners and Operators Have Violated and Continue to Violate the Storm Water Permit SWPPP Requirements

Information available to Coastkeeper indicates that Chula Vista Plant Owners and Operators have been and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. Serious and significant deficiencies include, for example, inaccurate and inconsistent descriptions of discharge locations and drainage generally throughout the Facility. First, Table 3.5 of the 2017 SWPPP claims that surface flows from drainage areas 2 through 12 are directed into sedimentation basins. This is untrue based on the language of the SWPPP itself and SDCK's own observations. The Site Map and descriptions of the drainage areas in Section 2.1.4 of the SWPPP both show that surface flows from drainage areas 1 through 6 actually drain to discharge points. The failure to properly identify discharge locations has further resulted in the failure to develop and describe necessary BMPs in the SWPPP (and to implement an adequate SWPPP).

Further, the descriptions of the discharge points themselves are inconsistent. Table 5.2 names four discharge locations, identified as DP-1 through DP-4. DP-3, located in drainage area 3, is described as "[requiring a] large surcharge."[29] No explanation is provided as to why this discharge point requires a "large surcharge," and this discharge point has only been sampled two times in the previous five reporting years, so when it is sampled, there is not enough context provided by the sample results to determine what this could mean. In addition, SWPPP Table 5.3 claims that drainage area 7 includes an unlined sedimentation basin with overflow to the Otay River. This is inconsistent with prior sections of the SWPPP that claim surface flows in drainage area 7 flow to the retention pond in drainage area 8. Based on Section 2.1.4 of the SWPPP and the Facility Map, Coastkeeper believes that stormwater surface flows in drainage areas 1 through 6 all flow directly into the Otay River through pipes that transect the berm in drainage areas 1, 3, and 4. Finally, the 2017 SWPPP is inconsistent with its accounting of potential discharge locations. Section 5.5.5 claims "[t]here are five (5) likely discharge location(s)"; Section 5.6.2 identifies "a total of seven (7) possible sampling location(s)"; and Tables 5.2 and 5.4 claim there are only four discharge points and four sampling points. Despite this, the Facility has never sampled from more than one discharge location at a time, as is required by Section XI.B.5 of the Storm Water Permit.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling of non-storm water with storm water, and the subsequent

---

[29] See 2017 SWPPP, Table 5.2.

discharge of high concentrations of pollutants from the Facility, in violation of the Storm Water Permit. As discussed *supra*, Coastkeeper's visual observations of the extensive trackout of fine particulates via the Facility's access road, strongly indicate the Facility lacks adequate storm water and non-storm water BMPs. Furthermore, the Facility lacks any BMPs around the massive stockpiles of materials. The Facility Owners and/or Operators have failed to implement any erosion control measures, silt fences, waddles, or any other type of structural or non-structural BMP to prevent or reduce polluted runoff from the stockpiles, and discharging into the Otay River via multiple berm transect pipes. Thus, the Facility Owners and/or Operators have failed to develop and implement a SWPPP with adequate BMPs as required by Section X.H. of the Storm Water Permit.

The Facility Owners and/or Operators have failed to revise the Facility's SWPPP to ensure compliance with the Permit. As previously noted, the SWPPP's accounting of drainage areas and discharge points contradicts itself, is inaccurate, and fails to align with actual site conditions. The current SWPPP fails to include any information about the large processing plant on the southern side of the Facility, which is either completed or has been under construction for the past two to three years. Furthermore, satellite imagery indicates significant changes to the locations of some of the Facility's mining activities and other industrial operations, as well as major changes to drainage area size and delineation. The Facility Owners and/or Operators failure to revise and update the SWPPP is a violation of the Section X.B. Storm Water Permit.

Accordingly, the Chula Vista Plant Owners and Operators have failed and continue to fail to adequately develop, implement, and/or revise a sufficient SWPPP, in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. Likewise, each and every failure of the Chula Vista Plant Owners and Operators to meet a specific requirement of the Storm Water Permit's SWPPP requirements is a violation of the Storm Water Permit and the Clean Water Act. As such, the Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least February 27, 2018, and likely long before that date. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least February 27, 2018.

E. **Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program**

The Storm Water Permit requires permittees to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting, and in order to continue, industrial activities. The M&RP requirements of the Storm Water Permit, as well as the Chula Vista Plant Owners and Operators' violations of them, are set forth below.

1. Storm Water Permit M&RP Requirements

Sections X.I. and XI.A-D of the Storm Water Permit require facility operators to develop and implement an adequate M&RP that meets all of the requirements of the Storm Water Permit. The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (*See* Storm Water Permit, Section XI.)  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. (*Id*.)

Section XI.A. of the Storm Water Permit requires all visual observations of drainage areas and locations at least once each month, as well as at the same time sampling occurs at a discharge location. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. (*Id*., Section XI.A.2.)  Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. (*Id*., Section XI.A.3.)

Section XI.B.6.a-b of the Storm Water Permit requires all permittees to analyze samples for total suspended solids, oil and grease, and pH. The Storm Water Permit further requires permittees to analyze samples for pollutants associated with their industrial operations, additional applicable parameters listed in Table 1 of the Permit based on SIC code, and industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. (*Id*., Section XI.B.6.c-e.)

> 2. <u>Chula Vista Plant Owners and Operators have Violated and Continue to Violate the Storm Water Permit M&RP Requirements</u>

Chula Vista Plant Owners and Operators have and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP.

For example, the Chula Vista Plant Owners and Operators have failed and continue to fail to develop an M&RP that ensures the collection of storm water samples from all discharge locations at the Facility. While the Chula Vista Plant Owners and Operators have maintained that they have four storm water discharge locations in both of their Annual Reports since 2016, they have only collected samples from a single discharge location, varying between DP-1, DP-3, and an unknown discharge point called "Chula Vista DP." As mentioned above, the 2017 SWPPP states that there are at least four, and may be as many as seven discharge points throughout the Facility. Most of the Facility's twelve or more drainage areas lack any retention capacity indicating they will discharge during each rain event. The failure to collect samples at all discharge locations is a violation of the Storm Water Permit's Monitoring and Reporting Requirements.

Furthermore, the Chula Vista Plant Owners and Operators have regularly failed to sample the required number of Qualifying Storm Events ("QSEs")[30] during a permit year. Under the Storm Water Permit, a discharger is required to collect and analyze a total of four storm water samples during the year, specifically two samples between July 1 and December 31, and two samples between January 1 and June 30. The Chula Vista Plant Owners and Operators failed to collect four samples in every permit year since the 2016-2017 permit year. In the two Annual Reports the Facility did file, a lack of QSEs was cited as the reason for the lack of sampling. The U.S. Environmental Protection Agency estimates that a rain event that will produce a discharge from a facility as one that produces at least 0.1 inches of precipitation in a 24-hour period. The rainfall data collected in Exhibit B shows well over 100 days with 0.1 inches of rainfall or more at the Brown Field Municipal Airport since June 2017. The Facility has been operating at least five days a week for this whole period, but Chula Vista Plant Owners and Operators have failed to collect the requisite number of storm water samples despite ample opportunities to do so.

The Chula Vista Owners and Operators have also failed to analyze storm water samples for all parameters required. (*See* Storm Water Permit, Section XI.B.6.) As previously discussed in Section I.B, *supra*, SIC code 1442 (Construction Sand and Gravel) applies to the Facility. Table 1 of the Storm Water Permit requires facilities with SIC code 144X (sand and gravel) to analyze samples for N+N, however, the Facility has repeatedly failed to do so in violation Section XI.B.6.d. (*See* Exhibit A). The Facility has also failed to analyze for all parameters associated with its industrial activities including metals, such as iron, aluminum, copper, and zinc; nitrogen, N+N; total suspended solids TSS; TDS; trash, as further discussed in Section II.B, *supra*. (*See* Storm Water Permit, Section XI.B.6.c.) . The Facility has also failed to analyzed samples for applicable industrial parameters related to receiving waters with 303(d) listed impairments. The Otay River is impaired for copper, zinc, toxicity, dissolved oxygen, phosphorus, benthic community effects, and TDS, and yet the Facility has failed to analyze samples for any of these pollutants. (*See* Storm Water Permit, Section XI.B.6.e.)

Furthermore, based on information available to Coastkeeper, the Chula Vista Plant Owners and Operators have failed to conduct the monthly visual observations of storm water discharges in violation of Section XI.A.3 of the Storm Water Permit.

In sum, the Chula Vista Plant Owners and Operators have failed and continue to fail to adequately develop, implement, and/or revise an M&RP, in violation of M&RP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or revised M&RP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. Likewise, each and every failure of the Chula Vista Plant Owners and Operators to meet a specific requirement of the Storm Water Permit's monitoring and reporting requirements is a violation of the Storm Water Permit and the Clean Water Act. The Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least February 27, 2018, and likely long before that date. These violations are ongoing, and Coastkeeper will include additional violations when

---

[30] A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. (Storm Water Permit, Section XI.B.1.)

information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least February 27, 2018.

### F.       Failure to Comply with the Storm Water Permit's Reporting Requirements

Section XVI.A of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 15 each year. Section XVI.B requires that the Annual Report include a Compliance Checklist that indicates whether a Discharger complies with and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance, an identification of all revisions to the SWPPP made during the previous reporting year, and the date(s) of the Annual Evaluation. (Storm Water Permit, Sections XVI.B.1-4.) Permittees are also required to report all sampling and analytical results within 30 days of obtaining the results. (*See* Storm Water Permit, Section XI.B.11.) In addition, the Storm Water Permit requires a Permittee whose discharges violate Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards, along with an implementation schedule. (Storm Water Permit, Section XX.B.)

The Chula Vista Plant Owners and Operators have failed and continue to fail to submit Annual Reports that comply with these reporting requirements. The Facility failed to submit an Annual Report for the 2014-2015, 2015-2016, 2017-2018, and 2018-2019 reporting years. The Annual Reports filed in the 2016-2017 and 2019-2020 had multiple deficiencies, including but not limited to: (1) claiming a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section XV of the Storm Water Permit; (2) claiming the SWPPP's BMPs address existing potential pollutant sources; and (3) claiming the SWPPP complies with the Storm Water Permit. These certifications are erroneous because, as discussed in detail above, the Facility's BMPs and SWPPP are woefully inadequate and fail to comply with the Storm Water Permit. These failures and omissions violate the Storm Water Permit, yet the Annual Reports fail to identify these violations or identify steps that will be taken to correct them as required.

The Chula Vista Plant Owners and Operators have submitted incomplete and/or incorrect Annual Reports and continue to fail to submit complete and correct reports that comply with the Storm Water Permit. Every day the Chula Vista Plant Owners and Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Chula Vista Plant Owners and Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least February 27, 2018. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Chula Vista Plant Owners and Operators are subject to civil penalties for all violations of the Clean Water Act on a per day per violation basis for each individual violation of the Storm Water Permit and the Clean Water Act occurring since at least February 27, 2018.

### G.     Failure to Comply with Exceedance Response Action Requirements

The Storm Water Permit incorporates a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). (Storm Water Permit, Section I.N.75.) The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. (*Id.*, Section XII.B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. (*Id.*, Section XII.C.) Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. (*Id.*) The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. (*Id.*, Sections XII.C.1.a–b.) Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. (*Id.*, Section XII.C.2.) The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. (*Id.*) The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. (*Id.*) "A Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.*, Section I.N.77.

The Facility Owners and/or Operators have failed to comply with several of the Storm Water Permit's ERA requirements. The Facility's storm water monitoring data from the 2021-2022 reporting period shows the Facility exceeded the annual average NAL for N+N with a concentration of 8.3 mg/L, well over the limit of 0.68 mg/L. (Ex. A). As such, the Facility entered Level 1 status for the aforementioned TSS on July 1, 2022. However, the Owners and/or Operators failed to complete a Level 1 ERA evaluation by October 1, 2022, as required by Section XII.C.1 of the Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2023, as required by Section XII.C.2. In fact, the Facility has failed to complete any Level 1 ERA reports to date.

The Facility Owners and/or Operators' failure to comply with the Storm Water Permit's ERA requirements is an ongoing violation of the Permit and Clean Water Act. The Facility Owners and/or Operators are in daily violation of the Permit and Clean Water ACt. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting an adequate Level 1 ERA Report, complete SWPPP

revisions, and implement the required BMPs is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Permit's Level 1 status ERA evaluation requirement every day since October 1, 2022. The Facility Owners and/or Operators have been in daily and continuous violation of the Permit's Level 1 ERA Report requirements every day since January 1, 2023. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Storm Water Permit's requirements.

## IV.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties in excess of $59,973 per day per violation for violations that occurred after November 2, 2015 where penalties are assessed on or after January 12, 2022.

In addition to civil penalties, Coastkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## V.    PERSONS RESPONSIBLE FOR THE VIOLATIONS

Coastkeeper puts Chula Vista Plant Owners and Operators on notice that they, and each of them, are responsible for the violations described above. If additional companies or persons are subsequently identified as also being responsible for the violations set forth above, Coastkeeper puts you on formal notice that it intends to include them in this action.

## VI.    NAME AND ADDRESS OF NOTICING PARTY

The name, mailing address, and telephone number of the noticing party is as follows:

San Diego Coastkeeper
8305 Vickers St., Suite 209
San Diego CA 92111 Phone: (619) 758-7743
Email: info@sdcoastkeeper.org

## VII.   COUNSEL

Coastkeeper has retained legal counsel to represent it in this matter. Please direct **all** communications to:

Drevet Hunt
Legal Director
California Coastkeeper Alliance
1100 11th Street, 3rd Floor
Sacramento, CA 98514
Phone: (415) 606-0864
Email: dhunt@cacoastkeeper.org

Patrick McDonough
Senior Attorney
San Diego Coastkeeper
8305 Vickers St., Suite 209
San Diego CA 92111
Phone: (619) 758-7743
Email: patrick@sdcoastkeeper.org

## VIII.   CONCLUSION

Coastkeeper is interested and eager to discuss implementation of effective remedies for the violations described in this Notice Letter. If you wish to pursue such discussions, please contact Mr. McDonough. To avoid prejudice to its interests, Coastkeeper does not intend to delay filing a complaint at the end of the 60-day notice period, but nonetheless remains willing and able to discuss remedies for the violations identified in this letter. If you wish to pursue such discussion, we suggest that you initiate them at your earliest convenience, and well before the 60-day notice period provided for by the Clean Water Act expires.

Sincerely,

Patrick McDonough
Senior Attorney
San Diego Coastkeeper

Drevet Hunt
Legal Director
California Coastkeeper Alliance

Exhibit B 56

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control
Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Michael Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Martha Guzman
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 3/4/22 | DP-3 | Nitrate as N | mg/L | 8.3 | 1.0 | 0.68 |
| 3/4/22 | DP-3 | Nitrate Nitrite as N | mg/L | 8.3 | 1.0 | 0.68 |
| 3/4/22 | DP-3 | Oil and Grease | mg/L | ND | | 25 |
| 3/4/22 | DP-3 | Total Suspended Solids (TSS) | mg/L | 93 | | 100 |
| 3/4/22 | DP-3 | pH | SU | 7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/14/21 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 12/14/21 | Chula Vista DP | TSS | mg/L | 3.2 | | 100 |
| 12/14/21 | Chula Vista DP | pH | SU | 7.3 | 6.5 - 8.5 | 6.0 - 9.0 |
| 10/5/21 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 10/5/21 | Chula Vista DP | TSS | mg/L | 23 | | 100 |
| 10/5/21 | Chula Vista DP | pH | SU | 7.6 | 6.5 - 8.5 | 6.0 - 9.0 |
| 1/29/21 | DP-3 | Oil and Grease | mg/L | ND | | 25 |
| 1/29/21 | DP-3 | TSS | mg/L | 21 | | 100 |
| 1/29/21 | DP-3 | pH | SU | 7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/23/19 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/23/19 | DP-1 | TSS | mg/L | 21 | | 100 |
| 12/23/19 | DP-1 | pH | SU | 7.7 | 6.5 - 8.5 | 6.0 - 9.0 |
| 11/29/18 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 11/29/18 | Chula Vista DP | TSS | mg/L | 93 | | 100 |
| 11/29/18 | Chula Vista DP | pH | SU | 7.8 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/28/18 | Chula Vista DP | Oil and Grease | mg/L | ND | | 25 |
| 2/28/18 | Chula Vista DP | TSS | mg/L | 47 | | 100 |

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 2/28/18 | Chula Vista DP | pH | SU | 7.8 | 6.5 - 8.5 | 6.0 - 9.0 |
| 5/6/16 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 5/6/16 | DP-1 | TSS | mg/L | 4.2 | | 100 |
| 1/4/16 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 1/4/16 | DP-1 | TSS | mg/L | 32 | | 100 |
| 1/4/16 | DP-1 | pH | SU | 6 | 6.5 - 8.5 | 6.0 - 9.0 |
| 12/22/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/22/15 | DP-1 | TSS | mg/L | 1.8 | | 100 |
| 12/11/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 12/11/15 | DP-1 | TSS | mg/L | 6.4 | | 100 |
| 12/11/15 | DP-1 | pH | SU | 6.5 | 6.5 - 8.5 | 6.0 - 9.0 |
| 9/15/15 | DP-1 | Oil and Grease | mg/L | ND | | 25 |
| 9/15/15 | DP-1 | TSS | mg/L | 340 | | 100 |
| 9/15/15 | DP-1 | pH | SU | 7.64 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/23/14 | OF-1A | pH | SU | 7.81 | 6.5 - 8.5 | 6.0 - 9.0 |
| 2/23/14 | OF-1A | TSS | | 150 | | 100 |
| 2/23/14 | OF-1A | Specific Conductance | umhos/cm | 4500 | | |
| 2/23/14 | OF-1A | Oil and Grease | | ND | | 25 |
| 2/23/14 | OF-1A | Total Organic Carbon | mg/L | 7.7 | | |
| 1/30/13 | OF-1B | Resistivity | ohm cm | 300 | | |
| 1/29/13 | OF-1B | pH | SU | 8.03 | 6.5 - 8.5 | 6.0 - 9.0 |
| 1/28/13 | OF-1B | Specific Conductance | umhos/cm | 3300 | | |
| 1/27/13 | OF-1B | Total Organic Carbon | mg/L | 6.4 | | |
| 1/26/13 | OF-1B | TSS | | 250 | | 100 |
| 1/25/13 | OF-1B | Oil and Grease | | ND | | 25 |
| 12/12/11 | OF-1B | Oil and Grease | mg/L | ND | | 25 |
| 12/12/11 | OF-1B | Nitrate/Nitrite-N | mg/L | 79 | 1.0 | 0.68 |
| 12/12/11 | OF-1B | TSS | mg/L | 570 | | 100 |
| 12/12/11 | OF-1B | Specific Conductance | umhos/cm | 4800 | | |
| 12/12/11 | OF-1B | pH | SU | 8.2 | 6.5 - 8.5 | 6.0 - 9.0 |

| Date of Sample Collection | Sample Location | Parameter | Units | Result | Basin Plan WQO/CTR | EPA Benchmark |
|---|---|---|---|---|---|---|
| 11/4/11 | OF-1B | Oil and Grease | mg/L | ND | | 25 |
| 11/4/11 | OF-1B | Iron | mg/L | 36 | 0.3 | 1 |
| 11/4/11 | OF-1B | Nitrate/Nitrite-N | mg/L | 67 | 1.0 | 0.68 |
| 11/4/11 | OF-1B | TSS | mg/L | 120 | | 100 |
| 11/4/11 | OF-1B | Specific Conductance | umhos/cm | 4800 | | |
| 11/4/11 | OF-1B | pH | SU | 7.7 | 6.5 - 8.5 | 6.0 - 9.0 |

| Date | Daily Precipitation (inches) |
|---|---|
| 2/12/2018 | 0.02 |
| 2/14/2018 | 0.06 |
| 2/18/2018 | 0.03 |
| 2/19/2018 | 0.04 |
| 2/23/2018 | 0.02 |
| 2/27/2018 | 0.76 |
| 3/3/2018 | 0.02 |
| 3/10/2018 | 0.39 |
| 3/13/2018 | 0.02 |
| 3/14/2018 | 0.04 |
| 3/15/2018 | 0.13 |
| 3/17/2018 | 0.37 |
| 3/18/2018 | 0.02 |
| 3/22/2018 | 0.03 |
| 3/23/2018 | 0.01 |
| 4/19/2018 | 0.06 |
| 4/30/2018 | 0.01 |
| 5/2/2018 | 0.06 |
| 5/12/2018 | 0.04 |
| 5/20/2018 | 0.01 |
| 5/21/2018 | 0.02 |
| 10/5/2018 | 0.02 |
| 10/12/2018 | 0.09 |
| 11/22/2018 | 0.13 |
| 11/29/2018 | 0.91 |
| 11/30/2018 | 0.14 |
| 12/1/2018 | 0.02 |
| 12/5/2018 | 0.61 |
| 12/6/2018 | 1.07 |
| 12/25/2018 | 0.27 |
| *12/31/2018* | *0.01* |

| Date | Daily Precipitation (inches) |
|---|---|
| 1/5/2019 | 0.11 |
| 1/6/2019 | 0.27 |
| 1/12/2019 | 0.36 |
| 1/14/2019 | 0.52 |
| 1/15/2019 | 0.13 |
| 1/17/2019 | 0.24 |
| 1/18/2019 | 0.01 |
| 1/21/2019 | 0.01 |
| 1/31/2019 | 0.41 |
| 2/1/2019 | 0.01 |
| 2/2/2019 | 1.19 |
| 2/4/2019 | 0.25 |
| 2/5/2019 | 0.26 |
| 2/6/2019 | 0.01 |
| 2/10/2019 | 0.04 |
| 2/13/2019 | 0.51 |
| 2/14/2019 | 1.03 |
| 2/15/2019 | 0.09 |
| 2/16/2019 | 0.02 |
| 2/17/2019 | 0.18 |
| 2/18/2019 | 0.21 |
| 2/20/2019 | 0.41 |
| 2/21/2019 | 0.37 |
| 3/2/2019 | 0.14 |
| 3/3/2019 | 0.01 |
| 3/5/2019 | 0.01 |
| 3/6/2019 | 0.1 |
| 3/7/2019 | 0.03 |
| 3/8/2019 | 0.12 |
| 3/11/2019 | 0.4 |
| 3/12/2019 | 0.04 |
| 3/20/2019 | 0.02 |

| Date | Daily Precipitation (inches) |
|---|---|
| 3/21/2019 | 0.05 |
| 4/3/2019 | 0.08 |
| 4/6/2019 | 0.02 |
| 4/16/2019 | 0.03 |
| 4/28/2019 | 0.01 |
| 4/29/2019 | 0.04 |
| 4/30/2019 | 0.11 |
| 5/5/2019 | 0.02 |
| 5/6/2019 | 0.01 |
| 5/10/2019 | 0.02 |
| 5/11/2019 | 0.03 |
| 5/16/2019 | 0.04 |
| 5/19/2019 | 0.38 |
| 5/20/2019 | 0.12 |
| 5/21/2019 | 0.12 |
| 5/22/2019 | 0.12 |
| 5/26/2019 | 0.19 |
| 6/21/2019 | 0.03 |
| 6/24/2019 | 0.01 |
| 9/4/2019 | 0.14 |
| 9/25/2019 | 0.02 |
| 9/27/2019 | 0.02 |
| 11/19/2019 | 0.41 |
| 11/20/2019 | 1.04 |
| 11/21/2019 | 0.62 |
| 11/27/2019 | 0.29 |
| 11/28/2019 | 1.69 |
| 11/29/2019 | 0.26 |
| 11/30/2019 | 0.11 |
| 12/3/2019 | 0.04 |
| 12/4/2019 | 1.61 |
| 12/6/2019 | 0.15 |

| Date | Daily Precipitation (inches) |
|---|---|
| 12/7/2019 | 0.16 |
| 12/8/2019 | 0.05 |
| 12/23/2019 | 1.43 |
| 12/24/2019 | 0.34 |
| 12/25/2019 | 0.03 |
| 12/26/2019 | 1.13 |
| 1/9/2020 | 0.07 |
| 1/17/2020 | 0.04 |
| 1/20/2020 | 0.01 |
| 1/21/2020 | 0.19 |
| 2/9/2020 | 0.12 |
| 2/10/2020 | 0.41 |
| 2/22/2020 | 0.25 |
| 2/23/2020 | 0.01 |
| 3/1/2020 | 0.09 |
| 3/2/2020 | 0.05 |
| 3/7/2020 | 0.02 |
| 3/8/2020 | 0.15 |
| 3/9/2020 | 0.15 |
| 3/10/2020 | 0.38 |
| 3/12/2020 | 0.39 |
| 3/13/2020 | 0.3 |
| 3/14/2020 | 0.04 |
| 3/16/2020 | 0.24 |
| 3/17/2020 | 0.2 |
| 3/18/2020 | 0.46 |
| 3/19/2020 | 0.29 |
| 3/22/2020 | 0.03 |
| 3/23/2020 | 0.21 |
| 3/25/2020 | 0.02 |
| 3/26/2020 | 0.06 |
| 3/27/2020 | 0.53 |

| Date | Daily Precipitation (inches) |
|---|---|
| 4/5/2020 | 0.01 |
| 4/6/2020 | 0.22 |
| 4/7/2020 | 0.64 |
| 4/8/2020 | 0.57 |
| 4/9/2020 | 0.32 |
| 4/10/2020 | 1.51 |
| 4/12/2020 | 0.02 |
| 4/13/2020 | 0.03 |
| 4/18/2020 | 0.04 |
| 6/5/2020 | 0.03 |
| 6/29/2020 | 0.05 |
| 10/25/2020 | 0.12 |
| 11/6/2020 | 0.02 |
| 11/7/2020 | 0.21 |
| 11/8/2020 | 0.21 |
| 12/14/2020 | 0.08 |
| 12/17/2020 | 0.04 |
| 12/24/2020 | 0.01 |
| 12/28/2020 | 0.8 |
| 12/29/2020 | 0.03 |
| 1/20/2021 | 0.02 |
| 1/21/2021 | 0.01 |
| 1/22/2021 | 0.01 |
| 1/23/2021 | 0.42 |
| 1/24/2021 | 0.2 |
| 1/25/2021 | 0.32 |
| 1/29/2021 | 1.11 |
| 2/12/2021 | 0.03 |
| 2/13/2021 | 0.02 |
| 2/16/2021 | 0.19 |
| 3/3/2021 | 0.77 |
| 3/10/2021 | 0.62 |

| Date | Daily Precipitation (inches) |
|---|---|
| 3/11/2021 | 0.15 |
| 3/12/2021 | 0.02 |
| 3/13/2021 | 0.04 |
| 3/15/2021 | 0.15 |
| 3/16/2021 | 0.06 |
| 3/23/2021 | 0.01 |
| 3/25/2021 | 0.04 |
| 3/26/2021 | 0.14 |
| 4/21/2021 | 0.01 |
| 4/23/2021 | 0.06 |
| 4/26/2021 | 0.05 |
| 4/27/2021 | 0.01 |
| 5/2/2021 | 0.05 |
| 9/24/2021 | 0.06 |
| 10/4/2021 | 0.44 |
| 10/5/2021 | 0.12 |
| 10/8/2021 | 0.1 |
| 10/25/2021 | 0.27 |
| 12/7/2021 | 0.02 |
| 12/9/2021 | 0.39 |
| 12/14/2021 | 1.07 |
| 12/16/2021 | 0.01 |
| 12/23/2021 | 0.52 |
| 12/24/2021 | 0.34 |
| 12/25/2021 | 0.21 |
| 12/26/2021 | 0.27 |
| 12/27/2021 | 0.1 |
| 12/28/2021 | 0.4 |
| 12/29/2021 | 0.12 |
| 12/31/2021 | 0.02 |
| 1/15/2022 | 0.04 |
| 1/17/2022 | 0.27 |

| Date | Daily Precipitation (inches) |
|---|---|
| 1/18/2022 | 0.19 |
| 2/15/2022 | 0.19 |
| 2/16/2022 | 0.23 |
| 2/21/2022 | 0.04 |
| 2/22/2022 | 0.54 |
| 2/23/2022 | 0.33 |
| 3/4/2022 | 0.84 |
| 3/5/2022 | 0.02 |
| 3/19/2022 | 0.02 |
| 3/20/2022 | 0.27 |
| 3/28/2022 | 1.19 |
| 3/29/2022 | 0.66 |
| 4/2/2022 | 0.01 |
| 4/3/2022 | 0.03 |
| 4/11/2022 | 0.16 |
| 4/21/2022 | 0.01 |
| 4/22/2022 | 0.16 |
| 5/20/2022 | 0.01 |
| 9/9/2022 | 0.27 |
| 9/11/2022 | 0.01 |
| 10/6/2022 | 0.02 |
| 10/11/2022 | 0.04 |
| 10/22/2022 | 0.09 |
| 10/23/2022 | 0.03 |
| 11/2/2022 | 0.05 |
| 11/3/2022 | 0.07 |
| 11/7/2022 | 0.01 |
| 11/8/2022 | 2.17 |
| 11/9/2022 | 0.1 |
| 11/29/2022 | 0.01 |
| 12/5/2022 | 0.01 |
| 12/11/2022 | 0.62 |

| Date | Daily Precipitation (inches) |
|---|---|
| 12/12/2022 | 0.04 |
| 12/27/2022 | 0.1 |
| 12/28/2022 | 0.49 |
| 12/31/2022 | 0.01 |
| | |
| | |
| | |

Exhibit B 64